UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ] | |
| | ] | No.    14-MJ-4172-DHH |
| v. | ] | |
| | ] | |
| JAMES MERRILL and | ] | |
| CARLOS WANZELER | ] | |

**GOVERNMENT'S MEMORANDUM IN OPPOSITION TO DEFENDANT
JAMES MERRILL'S MOTION TO REVOKE ORDER OF DETENTION**

The United States hereby opposes defendant James Merrill's motion to revoke the

Magistrate Court's determination that Merrill should be detained pending trial in this case.

## INTRODUCTION

James Merrill is the President of a company, TelexFree, Inc., that perpetrated one of the

largest pyramid schemes uncovered in recent memory, involving about 1,000,000 investors

("promoters") in dozens of countries and hundreds of millions of dollars.  As the "American

face" of TelexFree, Merrill was a minor celebrity to TelexFree promoters the world over, and so

enjoys a substantial network of international support, from Canada to the Dominican Republic to

Central and South America.  These supporters include his close friend of 20 years, co-defendant

Carlos Wanzeler, who is now a fugitive in Brazil.  The scheme was so large that, if convicted,

Merrill faces an advisory Guideline range of life (by about seven levels).

The Magistrate Court – which reviewed five search warrant applications in this case,

reviewed and approved the criminal complaint, and presided at the detention hearing itself – got

it right:  This is not the usual white collar case.  It doesn't matter how strong Merrill's ties are to

Ashland, Massachusetts, or how many of his friends or family express support or help post bond.

These are familiar elements of many white collar cases, since most white collar defendants live

otherwise normal suburban lives.  But as this case proceeds, the pressure on Merrill will be

1

enormous, his opportunities for refuge inside and outside the United States are greater than the norm, and he is the sole remaining defendant who can answer for an enormous fraud that affected in thousands of people. He should remain detained.

## STANDARD OF REVIEW AND NATURE OF HEARING ON APPEAL

The standard of review for pretrial detention orders under 18 U.S.C. § 3145(c) is "independent review" coupled with "deference to the determination of the [lower] court." *United States v. Jones*, 201 F.3d 429, **2 (1st Cir. 1999) (discussing standard of review on appeal from district court order that affirmed magistrate court order of detention); *see also United States v. O'Brien*, 895 F.2d 810, 812-14 (1st Cir. 1990) (formulating that standard of review as matter of first impression in this circuit).[1] As to the underlying issue, if the government demonstrates by a preponderance of the evidence that "no condition or combination of conditions will reasonably assure the appearance of the person as required," then Merrill should remain detained. *See* 18 U.S.C. § 3142(e)(1); *United States v. Patriarca*, 948 F.2d 789, 793 (1st Cir. 1991) (citing preponderance standard).

But this does not mean that the defendant gets a "do over" of the evidentiary hearing conducted two weeks ago. For one, if he did, the established standard of review would be meaningless, because this Court would in no way be "deferring" to the Magistrate Court's findings. Second, between the initial appearance and the detention hearing, prior counsel had a week to review the complaint affidavit, review all parallel filings in the bankruptcy and SEC actions, confer with Merrill and counsel for TelexFree, Inc., and take whatever other steps she

---

[1] *See also, e.g., United States v. Rebollo-Andino*, ___ F.3d ___, 312 Fed. Appx. 346, 347 (1st Cir. 2009) ("Having conducted an independent review tempered by deference to the district court's findings . . . we affirm."); *United States v. Tortora*, 922 F.2d 880, 882 (1st Cir. 1990) ("We approach our task mindful of our obligation to afford independent review, tempered by a degree of deference to the determinations made below."); *United States v. Rivera-Febre*, 2007 WL 4287515, *2, n.5 (D.P.R. Dec. 4, 2007) (same).

chose.  At the hearing itself, she filed a brief, cross-examined the case agent, and put up her own

witness (Merrill's wife).  There is no "new evidence" that the Court must now consider.  There is

only new counsel's conviction that he has a better handle on the case than prior counsel.  But

new counsel wanting his own shot at it is not a justification for doing all this again.

Merrill tries to bolster the argument for a do-over by asserting that Judge Hennessy's

ruling "rested largely, if not exclusively, upon his view of the strength of the government's case

and/or the nature and circumstances of the offense." *Def. Mtn*. at 24.  That is false; the ruling

was based principally on Merrill's potential connections and resources overseas, as Judge

Hennessy himself made clear:

> As indicated at the outset, the offense, and I'm not saying that this was the
> defendant's intention, but the offenses created a number of substantial ties for
> this defendant outside the United States:   In South America, in the Caribbean
> and Europe.   In these places, there are bank accounts that may or may not be
> under the control of the defendant, or that may have funds that he can access,
> but as the co-owner of Telex, as one of its founders, as the person with signatory
> authority, as one of the faces of the company, it's fair to infer that the defendant
> is in a position where he may be able to finance a life outside the United States
> to avoid the charges here, <u>and that is probably the principal concern of this
> Court</u>.

*Detention Hearing Transcript* (5/20/14) ("*5/20/14 Trans*.") at 12-13 (emphasis added).

But Merrill would rather argue about the opacity of TelexFree's compensation and

revenue systems than about whether the nature of TelexFree's operations, and Merrill's

role within them, increase the odds that he flees.

Moreover, Judge Hennessy's ruling – spanning 20 pages of oral findings – was

thoughtful and thorough.  That is enough.  As Judge Stearns noted in a 2009 decision,

> Consistent with the flexible standard endorsed in *Tortora,* I conclude that it is
> appropriate to confine *de novo* review of a detention order to the record created
> by the Magistrate Judge where his or her findings have clear support in the
> underlying record.  That is the case here. . . .  As the Court of Appeals defers
> respectfully to the credibility determinations of a first-instance court, so it

is appropriate for this court to defer to the credibility findings of the
Magistrate Judge[.]

*United States v. Foley,* \_\_\_ F.Supp.2d \_\_\_, 2009 WL 458558, \*2-3 (D. Mass. Feb. 24, 2009); *cf.*

*United States v. Simone*, 317 F. Supp. 2d 38, 42 (D. Mass. 2004) (giving only limited deference

to magistrate judge's detention findings "because the magistrate judge did not properly consider

the weight of the evidence and, particularly, did not in her brief and relatively cursory

Memorandum" address certain key facts presented below).

## ARGUMENT

### I.   MERRILL WAS THE VERY PUBLIC LEADER OF AN INTERNATIONAL PYRAMID SCHEME INVOLVING SUBSTANTIAL ASSETS OVERSEAS AND THOUSANDS OF SUPPORTERS IN DOZENS OF COUNTRIES

Until the scheme collapsed (although TelexFree chose to call it "filing for bankruptcy"),

Merrill was the leader and public face of a modern, and dangerous, form of the traditional Ponzi

scheme.  He was the President of TelexFree, Inc., a company that sold a "voice over internet"

("VOIP") product through the use of "multi-level" or "network" marketing.  TelexFree was a

global success.  From its inception in 2012 until its collapse in April 2014, it attracted between

750,000 and 1,000,000 investors worldwide and, according to the company's admission, took in

about $1,000,000,000.  *See Govt. Detention Exh*. 1 (complaint affidavit).[2]

#### A.   As Its Revenue Reflected, TelexFree Paid Its Investors Even if They Sold Nothing

But TelexFree was a pyramid scheme.  That is, the massive amount of revenue the

company received between February 2012 and April 2014 did not come from its VOIP product

selling like hotcakes, but from an ongoing influx of investor dollars, which it then paid out in

---

[2] The government's affidavit in support of the complaint issued against Merrill and Wanzeler
contains a more detailed summary of TelexFree's finances and how it operated.  A complete set of the
government's exhibits in support of detention has been forwarded to the Court.

commissions.  Becoming a TelexFree "promoter" cost $340 or $1425, depending on the level of buy-in.  But once someone signed up they were able, for example, to make a guaranteed 200% to 300% annual return on their investment for doing basically nothing and without selling a single VOIP product.  Merrill knew all of this.  And, as Merrill's motion itself illustrates, see *Def. Mtn*. at 18, the company tried hard to make it look legitimate.

Thus, the company did not describe this arrangement as "a guaranteed pay-out of $5200/year if you give us a $1425."  Instead it said that the initial $1425 was really the promoter paying for 10 "wholesale" VOIP products.  But the products were never delivered or seen by the promoter – it was just a ledger entry next to the promoter's name on the TelexFree web site.  The promoter was then required to post meaningless classified ads for TelexFree on web sites already bearing page after page of hundreds of identical ads.[3]  After the ads, unsurprisingly, failed to result in VOIP sales, TelexFree then "bought back" the 10 VOIP packages for $100, every single week – that is, it simply removed the ledger entry on the web site.  TelexFree did this 52 weeks a year.

The details of the TelexFree compensation scheme are easy to confirm –anyone with an Internet connection could read James Merrill's PowerPoint tutorial about how to get rich with TelexFree.  *See, e.g., Govt Exh*. 1 at 10-12 ("See our opportunity presented by our President James Merrill.").  Following the math for the various interlocking bonuses TelexFree paid, a promoter could make thousands of dollars without ever selling *anything*.

Unsurprisingly, as TelexFree's accounts reflect, over time about 99% of its incoming money was from new investors while about 1% was from VOIP sales.  And it was a lot of

---

[3] The government's complaint affidavit, see *Govt. Exhibit* 1 at pp. 10-12, discusses this process in detail, and contains a sample screenshot from one of the classified ad sites promoters were required to use.

money.  For example, in a single account, active for five months in 2013 and 2014, TelexFree

took in $234,705,815.  Of that, $425,696 was attributable to VOIP sales.  That's less than .2%.

*See 5/20/14 Trans*. at 6-9 (court's findings on TelexFree compensation and revenue).  As the

evidence showed at the detention hearing, see, *e.g.*, *Govt. Exh*. 1, and as Judge Hennessy

specifically noted in his findings, *5/20/14 Trans*. at 7-9, this ratio was consistent across

numerous bank accounts and credit card processing accounts between February 2012 and March

2014.

The existence of a TelexFree "back office," that is, an internal, Web-based system

allowing TelexFree promoters to accumulate and liquidate "credits," does not change the

calculus.  As Merrill acknowledges, the government is fully aware of the back office system.

Many multi-level marketing companies have these systems, which are useful for disguising the

actual ratios between revenue from investors and revenue from selling something to genuine

retail customers.  For example, every TelexFree promoter who wanted to earn bonuses for

recruiting other promoters was required to sell at least one VOIP package.  So, many TelexFree

promoters simply sold it to themselves, using a different user name, and then collected a 90%

commission on the sale, for a net cost to the promoter of $5.00.  These are not real customers,

but TelexFree's back office system counts them as such.  Meanwhile, every single TelexFree

bank and credit card account showed that actual VOIP sales were 1% or so of revenue, but

somehow, we are told, all of the missing, legitimate, sales are hiding in the back office – the one

revenue source that is *not* readily reviewable at this stage of the proceedings.[4]

---

[4]  A little digging reveals the creative accounting this system enabled.  For example, as described
in Government Exhibit 1 (the complaint affidavit, at pp. 25-26), in March 2014 Merrill and Wanzeler
hosted a TelexFree conference in Boston.  An undercover agent was there.  Wanzeler told the crowd that
TelexFree's VOIP product had "600,000 customers."  Meanwhile, at a hearing last month in TelexFree's
Chapter 11 proceedings, TelexFree's CEO, Stuart MacMillan, testified that the latest figures showed
about 80,000 to 100,000 users.  Finally, a rough tally of the unique call-in numbers that used TelexFree's

Over time TelexFree used its substantial incoming revenues to cover its promised returns to existing investors but, as in any Ponzi scheme, the amounts owed eventually outstripped amounts coming in.  By the time TelexFree collapsed in April 2014 (it sought bankruptcy protection in Nevada federal court on April 14, 2014), it owed about $5,000,000,000 in bonuses and commissions to its promoters.

**B.    Merrill's "Rock Star" Status and TelexFree's International Scope**

As the government emphasized at Merrill's detention hearing, understanding the risk of releasing him requires understanding the unique aspects of the TelexFree phenomenon.  It is these aspects that ultimately convinced the Magistrate Court that this case is unlike the general run of white collar cases.

*First*, like many "multi-level marketing" companies, TelexFree has a disturbingly cult-like quality.  Egged on by the company itself, promoters spoke of "reaching their dreams" and being "100% TelexFree."  TelexFree's promoter extravaganzas – in the United States, Brazil and Spain, among other places – were recorded and posted on YouTube.  These events had a "boisterous . . . rock concert atmosphere," at which crowds of promoters cheered James Merrill when he took the stage.  *See Detention Hearing Transcript* (5/16/14) at 15-19 ("*5/16/14 Trans.*").  Merrill would have the crowd "do the wave."  As the "American face" of TelexFree, crowds of foreign promoters lined up to have their pictures taken with Merrill; his wife conceded

---

VOIP system to make calls between January and April 2014 showed only 65,799 unique users in that period, though that is a preliminary figure at this point.

Similarly, in the interrogatory answers TelexFree filed with the Massachusetts Securities Division in February 2014, it reported about $240,000,000 in retail VOIP sales (which is where Merrill gets the figure used in his motion).  Meanwhile, according to witnesses, TelexFree's outside accountant was told it was only about $70,000,000 – a figure he could not confirm – and, as noted above, bank records, credit card processing records, and available hard data on number of VOIP users all imply that it was something far lower than that.

that he was "treated like a minor celebrity." *Id*. at 42.  In or about November 2013, TelexFree rented a cruise ship and invited thousands of promoters to join a cruise off the coast of Brazil. Merrill addressed the crowd of (at least) hundreds from the promenade deck, helicopter hovering in the background. *Id*. 43-44; *5/20/14 Trans*. at 11-12 (court's findings).[5]

*Second*, thousands of these promoters do not live in the United States, but in Canada, the Caribbean, and Central and South America.  *See 5/16/14 Trans*. at 15; *5/20/14 Trans*. at 9 (court's findings).  Thousands remain fanatically loyal to the company which, despite the bankruptcy and three government enforcement actions, they see as helping hard working people make a little money on the side.  *See 5/16/14 Trans*. at 18-19; *Govt Exh*. 2 (binder of hundreds of letters of support for TelexFree, submitted by promoters worldwide in the SEC civil action). Many TelexFree promoters, at least the earlier ones, made substantial sums from their involvement.

*Third*, TelexFree itself exists in several foreign countries, including Canada, Brazil, the United Kingdom and the Dominican Republic.  According to Canadian corporate filings, Merrill and Wanzeler are the directors of TelexFree Canada, see *Govt Exh*. 4, the Facebook page for which lists 7,691 "likes" and shows dozens of supportive messages, all written after the bankruptcy and enforcement actions were filed.  Merrill and Wanzeler are also the directors of TelexFree's Dominican entity.  This is nothing, however, compared to TelexFree's presence in Brazil, where thousands of Brazilian promoters took to the streets in June 2013 when the Brazilian government sued TelexFree's Brazilian entity for running a pyramid scheme.  *See*

---

[5]  "Finally, I find that the defendant made statements at corporate events that were sponsored by TelexFree about the success of TelexFree.   He reported that the company was doing great, he spoke highly of Wanzeler, and touted his efforts and the efforts of the company.   Promoters enthusiastically supported the defendant when he traveled.   They tried to be photographed with him and they treated him, according to the testimony of the agent, like he was a rock star."

*5/16/14 Trans*. at 10.  This happened again when enforcement activity ramped up in the United States.

Moreover, Merrill's co-defendant, Carlos Wanzeler, is now in Brazil, having fled the United States after federal agents executed a search warrant at TelexFree's Marlborough headquarters.  Wanzeler has access to substantial funds and has been Merrill's close friend for 20 years.  *See 5/16/14 Trans*. at 30-31; *5/20/14 Trans*. at 11-12.  Years ago, Merrill sponsored Wanzeler and his wife for their green cards.  *See 5/16/14 Trans*. at 30-31, 35; *5/20/14 Trans*. at 11-12.  One witness has described the two men as "like brothers."  According to bank records, in February 2013, Wanzeler gave Merrill a check for $865,000, using funds drawn from TelexFree's Brazilian operations.  In December 2013 – around the time he withdrew $3,000,000 for himself – Merrill authorized the transfer of about $7,000,000 to Wanzeler from TelexFree accounts.  The real risk here is not Merrill fleeing to Brazil, but Wanzeler helping him from that location.[6]

*Fourth*, TelexFree has substantial assets overseas.  The government has managed to freeze millions of dollars in United Kingdom and Singapore accounts, but various accounts remain unfrozen.  There is a TelexFree account in Cayman with the Royal Bank of Canada.  It remains unfrozen and the account balance is unknown.  Similarly, the government has seized a $10,000,000 cashiers' check made out to TelexFree Dominicana SRL – TelexFree's Dominican entity – but no Dominican accounts are frozen.  Finally, in or about 2013 Merrill and Wanzeler traveled to Singapore, where we know there are three accounts in the names of TelexFree and Carlos Wanzeler.  One of these accounts is frozen, but not the other two.  *See 5/16/14 Trans*. at

---

[6] Though note that, since 2008, Merrill has been to Brazil four times, as well as to Madrid and Narita, Japan.

20-21.[7]  Merrill was until recently the signatory on every TelexFree account in the United States.

*See 5/20/14 Trans.* at 6.  On top of the international assistance he could expect from Wanzeler or

countless promoters, it is unlikely that he does not have direct access to some of these funds.  *Id.*

at 12-13.

     *Finally*, Merrill's network of supporters is not just overseas.  He knows several TelexFree

promoters in the United States who made substantial sums with the company, and would be in a

position to assist him.  *See 5/16/14 Trans.* at 29-30.

## II.   AFTER AN EVIDENTIARY HEARING, JUDGE HENNESSY PROPERLY CONCLUDED THAT, BECAUSE OF TELEXFREE'S SUBSTANTIAL INTERNATIONAL SCOPE, MERRILL'S IMMENSE POPULARITY ABROAD, AND THE CONSEQUENCES OF CONVICTION, MERRILL MUST REMAIN DETAINED

     In light of the above, it's no surprise that Judge Hennessy ultimately opted for detention.

His analysis reflected precisely those aspects of the TelexFree scheme that are most troubling

from the viewpoint of flight:

> There's evidence, and I certainly think it's persuasive, that the defendant had a key
> role in a massive Ponzi scheme.   He faces 20 years in jail [on the single charge in
> the complaint], and there's something unique to this case that I haven't really seen
> in other cases where as a result of his participation in TelexFree, and in the alleged
> Ponzi scheme, the crime itself has created for the defendant a type of world outside
> the United States to which the defendant belongs.   There are associates outside
> the United States, including the defendant's close friend and former business
> partner, Carlos Wanzeler.   There are bank accounts outside the United States, and
> it's unclear how much money is in those accounts and whether the defendant has
> either direct signatory authority over those accounts or has the ability to instruct
> others to withdraw money from those accounts for the defendant.

*5/20/16 Trans.* at 3-4.

---

    [7]  During the May 16, 2014, hearing, the government also elicited testimony about an account in
St. Vincent & Grenadine.  *See id.* at 21.  It appears, however, that this account is *not* in the name of
TelexFree, but in the name of "Above and Beyond," an entity owned by Carlos Wanzeler.

In short, Judge Hennessy concluded that this was not the usual white collar case essentially because, unlike the usual white collar defendant, Merrill (a) potentially faces life in prison, and (b) should he decide to flee, a preponderance of the evidence shows that he has somewhere to go, and the means to go there.[8]  As the Magistrate Court found, in several countries there are "promoters who may be willing to assist the defendant.  As I said, these are people who treated the defendant like he was a rock star[.]"  *Id*. at 13.  Merrill's 20 year friendship with Carlos Wanzeler only compounded the concern:  not only could Wanzeler help Merrill flee, but Wanzeler might have a more personal stake in Merrill not being available to the government.  *Id*.

Other aspects of the case reinforced Judge Hennessy's reasoning, *e.g.*, the deceit inherent in the scheme Merrill and Wanzeler were running, *id*. at 14; the strength of the government's case, as evidenced in part by the fact that Wanzeler immediately fled the country upon learning that criminal authorities were involved, *id*. at 15; and even the very family ties Merrill cites as a reason to stay.  *Id*. at 19.

The Magistrate Court is deeply familiar with this case, having reviewed multiple search warrant applications and the criminal complaint, and having presided at the detention hearing itself.  This Court should defer to its conclusions.  *See, e.g., Rebello-Andino,* 312 Fed. Appx. at 347 (noting standard of independent review "tempered" by deference to lower court findings); *Foley,* ___ F.Supp.2d ___, 2009 WL 458558 at *2-3 (relying on evidence in earlier hearing because of magistrate's thoroughness).  As Merrill

---

[8] *See, e.g., United States v. Hernandez-Rodriguez*, 181 F.3d 81, *1 (1st Cir. Apr. 22, 1998) (affirming detention order; citing risk of flight to avoid unusually high prison sentence as supporting detention); *cf. United States v. Demmler*, 523 F. Supp. 2d 677, 684 (S.D. Ohio 2007) (allowing release because defendant had strong community ties, "[t]here is no evidence that Demmler has the kind of substantial personal or business relationships in any other jurisdiction that would cause him to seek refuge there," and defendant did not face enough prison time to realistically tempt him to flee).

himself notes, the detention statute was designed for defendants who have "both the resources and foreign contacts to escape to other countries with relative ease in order to avoid prosecution for offenses punishable by lengthy prison sentences." *Def. Mtn*. at 20 (citing cases and legislative history).  That is this case.

## III.    THE NEED FOR DETENTION IS NOT BASED ON A LACK OF TIES TO THE LOCAL COMMUNITY, NOR DOES IT DEPEND ON THE AMOUNT OF BOND

In his motion, Merrill argues that he has substantial local ties.  There is no question that he does.  But as the above analysis shows, highlighting Merrill's local ties misses the point. Judge Hennessy was fully aware of Merrill's ties to the community, see, *e.g.*, *5/20 14 Trans*. at 2-3; 18-19, but, as that judge noted, they must be balanced against Merrill's potential connections abroad.  That is, focusing on Merrill's local ties is focusing on half of the evidence. This is what Judge Hennessey meant when he noted several times that "[t]his is an unusual case." *Id*. at 2, 16, 18.

Moreover, as noted above, the very nature of Merrill's family ties, while supporting release, also supported detention:

> And so that's why, in my view, it's a double-edged sword.  The strong ties that the defendant has to his children and his commitment to them is both a reason he would stay here, but also a reason that he would flee, in order to avoid the fact that he may go to jail and be separated from them in that way.

*5/20/14 Trans*. at 19.  When Merrill's access to foreign emotional and material support is added to the calculus, along with the sentence he may face if convicted, the rationale for detention becomes plain.  And in a case involving thousands of victims, many of whom lost their life savings, the rationale becomes indisputable.

Nor is this analysis affected by putting up funds and property beyond the $300,000 in home equity Merrill originally proposed.  First, as the recipient of at least $3,865,000 in

TelexFree funds (most of which is now frozen), potential access to several accounts overseas, and confirmed access to loyal supporters, Merrill may be unfazed by the risk of these assets being forfeited.  Moreover, as Mrs. Merrill conceded during her testimony, Merrill's arrest was "a uniquely awful event, the type of event that [her] family has never experienced before." *5/16/14 Trans.* at 45.  Merrill is over 50 years old.  He potentially faces life in prison or, even if something substantially less, still a sentence that may keep him imprisoned into his senior years. Facing this kind of personal disaster, in light of available refuge elsewhere in the United States and overseas, bond is not reasonably likely to keep him here.  *See, e.g., United States v. Tomero*, 169 F. App'x 639, 641 (2nd Cir. 2006) ("Moreover, the district court found that, despite his ties to the community, defendant's potential for a fifteen-year sentence created a substantial risk of flight that remained a serious concern even when viewed in light of the defense proffer [of a "substantial bail package"].").[9]

Also note that, as Judge Hennessy observed, this case is fundamentally about deceit.  As Merrill and Wanzeler revved up investors, they hid the fact that TelexFree was a huge, teetering, pyramid scheme.  *See 5/20/14 Trans.* at 14 ("The second thing about the offense is that it involves deceit.   This was a scheme that depended on TelexFree constantly recruiting new promoters, and the defendant played a very large role in that deception.").  Someone willing to maintain that deception for months and years is someone who would consider finding ways to avoid this Court's reach.

---

[9] *See also, e.g., United States v. Kandasamy*, 2008 WL 2660610, *2-4 (E.D.N.Y. July 3, 2008), *aff'd sub nom.*, 2009 WL 692113 (2nd Cir. Mar. 18, 2009) (because of severity of possible sentence and uniquely international nature of underlying case, which included a network of supporters abroad, affirming detention despite strong local ties and bail package offering four residential properties and $300,000 cash as bond, surrender of passport, electronic monitoring, and relocation away from the Canadian border).

## **CONCLUSION**

The Court should defer to the findings of the Magistrate Court and detain James Merrill

pending trial.

Respectfully submitted,

Carmen M. Ortiz
United States Attorney

By:     /s/ *Andrew Lelling*
       Cory S. Flashner
       Andrew E. Lelling
       Assistant U.S. Attorneys

Date:  June 3, 2014

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent to those indicated as non-registered participants, on June 3, 2014.

<div align="center" style="margin-left:40%">

/s/ *Andrew Lelling*
Andrew E. Lelling

</div>