UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) No.   14-CR-40028-TSH |
| v. | ) |
| | ) Violations: |
| (1) JAMES MERRILL and | ) |
| (2) CARLOS WANZELER | ) Conspiracy to Commit Wire Fraud |
| | ) (18 U.S.C. § 1349) |
| | ) |
| | ) Wire Fraud |
| | ) (18 U.S.C. § 1343) |
| | ) |
| | ) Engaging in a Monetary Transaction in |
| | ) Property Derived from Wire Fraud |
| | ) (18 U.S.C. § 1957(a)) |
| | ) |
| | ) Aiding and Abetting |
| | ) (18 U.S.C. § 2) |
| | ) |
| | ) Forfeiture Allegations |
| | ) (18 U.S.C. §§ 981(a)(1)(C) & 982(a)(1) & |
| | ) 28 U.S.C. § 2461(c)) |

## FIRST SUPERSEDING INDICTMENT

The Grand Jury charges that:

### Relevant Entities and Persons

At all times relevant to this Indictment:

1.    JAMES MERRILL ("MERRILL") was an individual living in Ashland,

Massachusetts.

2.    CARLOS WANZELER ("WANZELER") was an individual living in

Northborough, Massachusetts.

3.    TelexFree, Inc., was a Massachusetts corporation with its principal place of

business at 225 Cedar Hill Street in Marlborough, Massachusetts.   Before changing its name in or

1

about February 2012, TelexFree, Inc., was known as Common Cents Communications, Inc. ("Common Cents"), which was incorporated by MERRILL, WANZELER and two other men in or about 2002. In October 2012 filings with the Massachusetts Secretary of State's Office, TelexFree, Inc., listed MERRILL and WANZELER as the sole officers and directors of the company. MERRILL and WANZELER owned and operated TelexFree, Inc.

4.     TelexFree LLC was a Nevada corporation with its principal place of business at 225 Cedar Hill Street in Marlborough, Massachusetts. It was incorporated by MERRILL, WANZELER and a third man in or about July 2012.

5.     Ympactus Comercial LTDA-ME ("Ympactus") was a Brazilian company formed in or about 2010. In or about 2012, MERRILL and WANZELER became partners in Ympactus with a third man in Brazil. Ympactus used the TelexFree name in Brazil and operated in that country. On or about June 13, 2013, Ympactus's operations in Brazil were suspended and its assets frozen by order of a Brazilian court, on suspicions that Ympactus was operating as a pyramid scheme.

6.     TelexFree, Inc., and TelexFree LLC (hereinafter collectively referred to as "TelexFree" or "the TelexFree entities") and Ympactus sold a "voice-over-internet-protocol" ("VoIP") telephone service called 99TelexFree. VoIP allows a user to make telephone calls through the Internet. Both Ympactus and TelexFree maintained a website, www.telexfree.com ("TelexFree Website"), which advertised TelexFree's compensation system and product, and encouraged people to become TelexFree promoters.

### General Allegations About the Nature of Pyramid Schemes

7.     Pyramid schemes typically feature a marketing or sales program in which, among

2

other things, participants pay into the program for the opportunity to be compensated for recruiting other people to join as well. Pyramid schemes typically involve a seemingly legitimate business that may in fact sell a usable product, but they derive the bulk of their revenue, not from bona fide sales of that product, but from new participants buying into the program. These schemes typically promise substantial returns for doing little beyond paying into the organization and convincing others to do the same.

8.    The sales programs underlying pyramid schemes are often layered with jargon, procedural complexities, a formalized hierarchy of participation, and other trappings, all of which create the appearance of a legitimate company pursuing a legal marketing program. But, as in "Ponzi"-type schemes, the organizers simply take in money from newly-invested participants and use those funds to pay the returns promised to earlier participants. These schemes are ultimately unsustainable because the returns promised to an ever-growing pool of participants must be paid using funds deposited by a necessarily finite pool of new participants. At some point the scheme must become too big, that is, it must eventually lack enough incoming funds to cover its financial commitments and, because underlying product sales cannot sustain the company, the scheme collapses.

## General Allegations About the Defendants' Fraud Scheme

9.    As set forth further below, the defendants devised, and intended to devise, a scheme to defraud, the purpose of which was to obtain money and property by means of materially false and fraudulent pretenses, representations, promises and omissions by, among other things, recruiting, and inducing existing promoters to recruit, an ever expanding group of new promoters for TelexFree, all of whom paid significant sums to join the company, which sums the defendants

3

used to pay promised returns to existing promoters and to enrich themselves.

## Manner and Means of the Scheme and Artifice to Defraud

10.     The manner and means by which the defendants accomplished the objectives of the conspiracy, and of the scheme and artifice to defraud, included, among others, the following:

   a.     MERRILL and WANZELER, who owned and operated TelexFree, maintained a compensation system that invited people to invest significant sums to join TelexFree, after which those persons could profit without selling TelexFree's 99TelexFree VoIP product.   MERRILL and WANZELER emphasized this aspect of TelexFree's compensation system to potential participants.

   b.     By virtue of this compensation system, from its inception TelexFree took in substantial sums, not from genuine retail sales of its VoIP product, but from new promoters buying into the TelexFree system.   That money was then used, in turn, to pay TelexFree's commission, bonus, and other financial obligations to existing promoters.   TelexFree's business operations, and ongoing commission and bonus payments to existing promoters, depended on the constant influx of funds from new promoters.

   c.     Notwithstanding the true nature and status of TelexFree's business operations, MERRILL and WANZELER made, and caused others to make, material misrepresentations and omissions to TelexFree promoters about the viability of the company; encouraged new promoters to invest in the company; and encouraged existing promoters to recruit others.   Moreover, in public

4

representations to current and potential promoters, MERRILL and WANZELER omitted, and caused others to omit, material information about the condition of the company and investigations of the company by various civil regulatory authorities in the United States and Brazil.

d.     MERRILL and WANZELER similarly deceived regulatory authorities about various aspects of TelexFree's business operations, including the fact that, at its core, TelexFree operated as a pyramid scheme.

## The Defendants' Use of TelexFree to Execute the Scheme to Defraud

## I.     The TelexFree Compensation System

11.     Between in or about early 2012 and on or about March 8, 2014, TelexFree's compensation plan was presented to potential promoters in various venues, including TelexFree's website, TelexFree instructional videos often available on the Internet, and at TelexFree conferences.

12.     All new promoters were required to first pay a $50 membership fee to TelexFree. After paying the fee, TelexFree set up a new "back office" page for that user on the TelexFree Website.   The user then had the option of buying an "AdCentral" package, for $289, or an "AdCentral Family" package, for $1,375.

13.     With both packages, TelexFree purported to give the promoter a "stock" of VoIP packages to sell though no actual, physical product was conveyed to the promoter.   The promoter could then copy small "classified"-type advertisements from the TelexFree Website and post them on one of several classified ad sites.   As MERRILL and WANZELER knew, most of these sites hosted page after page of dozens of nearly identical TelexFree advertisements, as numerous

promoters copied and pasted their ads to the same sites.

14. If a promoter posted ads for seven consecutive days, TelexFree would "buy back" the unsold VoIP stock from the promoter for $20 (under the AdCentral plan) or $100 (under the AdCentral Family plan), and would do so every week for the length of the year-long agreement.

15. As MERRILL and WANZELER knew, and as they advertised on the TelexFree Website, this system provided every TelexFree promoter a return of over 200% on his or her initial investment without being required to sell a single unit of TelexFree's VoIP product. As MERRILL and WANZELER also knew, many promoters bought multiple positions with TelexFree, that is, they signed up multiple times as a promoter in order to multiply their weekly and annual returns without having to sell any TelexFree product.

16. To qualify for various additional recruitment-related income streams that TelexFree made available, TelexFree purported to require each promoter to make one retail sale of the VoIP product. But as MERRILL and WANZELER knew, numerous promoters met this requirement by simply buying the VoIP product themselves, using a different user name, and paying the $49.90 monthly cost of the service with "credits" the promoter had accumulated in TelexFree's virtual "back office" system. Many of these promoters did not use the TelexFree product. Moreover, under TelexFree's compensation system, promoters received a 90% commission on the first month of usage by a VoIP customer they recruited. That is, after buying the VoIP product themselves with virtual credits, promoters were then reimbursed for 90% of the up-front cost. Moreover, there was no obligation to pay for subsequent months.

17. Promoters were paid to recruit other people, and further compensated when those people recruited additional people, and so on, without any one level of participants being required

6

to make genuine retail sales of TelexFree's VoIP product.

18.    For example, promoters were rewarded for direct recruitment of new promoters. For each direct recruit who bought into TelexFree at the AdCentral level (a total of $339), the recruiting promoter received a $20 "fast start" bonus.    For each direct recruit who bought into TelexFree at the AdCentral Family level (a total of $1,425), the recruiting promoter received $100. As above, and as MERRILL and WANZELER knew, excluding the purported "retail" sale of one VoIP product, promoters received these bonuses without any genuine retail product sales.

## II.    TelexFree's Accounts and "Back Office" System

19.    MERRILL was the signatory on most of TelexFree's bank and payment processing accounts, and MERRILL and WANZELER together were the signatories on others.    These accounts showed, as MERRILL and WANZELER knew, that TelexFree was bringing in only small amounts of money from people paying $49.90 a month to use its VoIP product, while the vast majority of the incoming cash to these accounts came from people paying in $349 or $1425 to sign up as promoters.    Moreover, as both men knew, during the course of the scheme several banks closed TelexFree's accounts because of concerns about TelexFree's activities.    In order to avoid having their bank accounts shut down, and to continue to receive incoming deposits of cash, MERRILL purposefully provided vague and misleading information to at least one financial institution about the nature of TelexFree's business.

20.    When promoters joined TelexFree, they used their "back office" page on the TelexFree Website to manage their sales activities.    Among other things, when promoters earned compensation from TelexFree, that compensation appeared as "credits" on the promoters' back office page, which the promoters could withdraw as cash once the credits reached a certain

balance.   In some instances, promoters could use their credits to "pay" for additional promoter positions in TelexFree, or for another person's VoIP service.   Consequently, TelexFree's back office system purported to reflect sales of the service.

21.   The back office system was generally managed by TelexFree employees in Brazil, but MERRILL and WANZELER had Internet-based access to the system and could request financial data from Brazilian or American employees.

22.   The back office system enabled MERRILL and WANZELER to manipulate how TelexFree's revenue figures were presented, including by overstating TelexFree's revenue from the sale of VoIP packages.   For example, as noted above, to qualify for certain bonuses promoters purportedly had to make at least one retail VoIP sale, but many promoters met that requirement by simply "buying" the VoIP product themselves with back office credits.   Every time a promoter "bought" a VoIP package in this manner, the purported sale was recorded in the back office system as a retail sale of TelexFree's VoIP product, even though, in reality, no one had sold the product to a real customer, and the vast majority of these VoIP packages remained unused.

## III.   MERRILL's and WANZELER's Public Statements about TelexFree

23.   MERRILL and WANZELER made, and caused others to make, material misrepresentations and omissions about TelexFree in public statements about the company. MERRILL and WANZLER knew and should have known that these misrepresentations and omissions were false, misleading, and made with reckless disregard for the truth.

### A.   The TelexFree Website

24.   During the relevant period, TelexFree maintained the TelexFree Website, which contained information about TelexFree's product and compensation plan, and invited members of

8

the public to become TelexFree promoters.

25.     The TelexFree Website specifically touted those aspects of TelexFree's compensation plan that allowed promoters to make money without selling TelexFree's product, thus helping to sustain the pyramid scheme underlying TelexFree's business.   In the relevant period, the site specifically advertised the AdCentral program and the chance to make $1040 a year after only paying in $289 and the $50 membership fee.   The site contained a "promoters" link that told potential promoters that they could, "Earn money doing announcements on Internet!"   That is, it told potential promoters that, after an initial investment in the company, they could make money for a year without selling TelexFree's product.   For example, in or about the summer of 2012 the website said, in part, the following:

> Be our promoter
> Earn money doing announcements on Internet!
> Through a ADCENTRAL, that you geot [sic] for the amount of US$299 (annually).
>
> The promoter will receive US$20 each week that makes 7 different announcements in websites of free announcements online, from Monday to Sunday.   All in a way fast, easy, and standardized in your virtual office (BO) Telexfree.
>
> This will be for the 52 weeks of the year, of your contract, then see the simulation:
>
> 52  weeks x $20 (Putting the 7 announcements) = $ 1,040 in the year

26.     Similarly, the TelexFree Website also contained a link, next to a photograph of MERRILL, bearing the caption, "See our opportunity presented by our President James Merrill." The link connected to a downloadable PowerPoint presentation, which the site described as, "The opportunity of your lifetime."

27.     As with the TelexFree Website, MERRILL's PowerPoint presentation urged people to sign up with TelexFree because they could make money without being required to sell

9

anything. One verion of the presentation said, "Earn money the smart way! Without having to invite anyone, without selling anything in the comfort of your own home." The presentation went on to explain the AdCentral program and the opportunity to make $1,040, or $5,200, a year, depending on the level at which the promoter bought into the program.

**B.    The Use of Internet-Based Media Sharing Sites and TelexFree's Public Events**

28.    MERRILL, WANZELER and other representatives of TelexFree used Internet-based media sharing sites, such as YouTube, to communicate with TelexFree's thousands of promoters. TelexFree created recordings specifically for Internet distribution and, as the defendants knew, recordings of TelexFree's corporate events were distributed via the Internet as well.

29.    MERRILL and WANZELER repeatedly made public statements to TelexFree's promoters at TelexFree events, often called "extravaganzas." These events were staged in various locations around the world, involving hundreds or thousands of promoters and presentations by MERRILL, WANZELER, and other TelexFree personnel. One such event, staged off the coast of Brazil in or about December 2013, was hosted on a cruise ship leased by TelexFree.

30.    During these events, MERRILL and WANZELER promoted an exciting, upbeat image of the company and its prospects. MERRILL spoke of how excited he was about the company, his confidence in WANZELER and other "leaders," and how TelexFree was "fighting for" its promoters. During a TelexFree event in or about March 2014, presenters, including MERRILL and WANZELER, touted the quality of TelexFree's VoIP product and the opportunity to "market" it. MERRILL told the crowd, among other things, "You're gonna get paid," and,

"We are here to help you make money." WANZELER announced that, in the preceding month, "Over 600,000 customers paid $49.90 to TelexFree99."

31.     During these events, neither MERRILL nor WANZELER indicated that TelexFree generated the bulk of its cash – the money it needed to pay commissions and bonuses – not from the sale of the VoIP product, but rather from the sale of TelexFree memberships to new promoters. Moreover, and as MERRILL and WANZELER knew, TelexFree did not have 600,000 retail VoIP customers using the product, but only a small fraction of that number.

C.     **Representations Involving Government Authorities**

32.     MERRILL and WANZELER also made, and caused to be made, material misrepresentations and omissions to TelexFree promoters about the existence and nature of government enforcement efforts against the company. Similarly, MERRILL and WANZELER made, and caused to be made, material misrepresentations and omissions to government agencies about TelexFree.

33.     For example, beginning in or about 2012, government authorities in Brazil began investigating TelexFree's operations in that country on the suspicion that TelexFree was a pyramid scheme. TelexFree had thousands of promoters in Brazil. Also, in or about April 2013, as MERRILL and WANZELER knew at the time, the Massachusetts Securities Division ("MSD"), an agency within the Massachusetts state government, began an official inquiry into TelexFree's business operations in Massachusetts. On or about January 22, 2014, and on or about February 5, 2014, the MSD issued subpoenas to TelexFree.

34.     In or about June 2013, government authorities in Brazil sued TelexFree's Brazilian operation and froze hundreds of millions of dollars in Brazilian accounts. In later public

11

statements, despite the fact that TelexFree's compensation system in Brazil was nearly identical to the U.S. system and shared the same website, and that TelexFree in the United States was already under investigation by the MSD as a possible pyramid scheme, MERRILL, WANZELER, and other TelexFree executives assured U.S. promoters that there was nothing to worry about. In later statements, in response to rumors reported on Internet blogs about investigations of TelexFree, a TelexFree executive publicly declared that there were no pending investigations of TelexFree "in any way, shape or form" and stated that there was "nothing going on."

## COUNT ONE

### (Conspiracy to Commit Wire Fraud – 18 U.S.C. § 1349)

35.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-34 of this Indictment and further charges that:

36.     Beginning in or about February 2012 and continuing through in or about April 2014, at Marlborough, in the District of Massachusetts and elsewhere, the defendants,

### (1) JAMES MERRILL and
### (2) CARLOS WANZELER,

knowingly conspired with each other and others known and unknown to the Grand Jury, to commit wire fraud, that is, having knowingly devised, and intending to devise, a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, transmitted and caused to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures and sounds, for the purpose of executing the scheme and artifice to defraud, in violation of 18 U.S.C. § 1343. All in violation of Title 18, United States Code, Section 1349.

## COUNTS TWO THROUGH NINE

### (Wire Fraud – 18 U.S.C. § 1343)

37.　The Grand Jury realleges and incorporates by reference paragraphs 1-34 of this Indictment, and further charges that:

38.　On or about the dates set forth below, at Marlborough, in the District of Massachusetts and elsewhere, the defendants,

### (1) JAMES MERRILL and
### (2) CARLOS WANZELER,

having knowingly devised, and intending to devise, a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, transmitted and caused to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures and sounds, for the purpose of executing the scheme and artifice to defraud, as set forth below:

| Count | Date | Wire Transmission |
|---|---|---|
| 2 | 12/26/2013 | Wire transfer from account XXXXX3859, at Fidelity Co-operative Bank and in the name of TelexFree, Inc., to account XXXXX6876, at Middlesex Savings Bank and in the name of James Merrill, in the amount of $136,200 |
| 3 | 12/26/2013 | Wire transfer from account XXXXX3859, at Fidelity Co-operative Bank and in the name of TelexFree, Inc., to account XXXXX5754, at Fidelity Co-operative Bank and in the name of Carlos Wanzeler, in the amount of $500,000 |
| 4 | 12/26/2013 | Wire transfer, from account XXXXX3859, at Fidelity Co-operative Bank and in the name of TelexFree, Inc., to account XXXXX5754, at Fidelity Co-operative Bank and in the name of Carlos Wanzeler, in the amount of $136,200 |

| 5 | 12/26/2013 | Wire transfer, from account XXXXX3859, at Fidelity Co-operative Bank and in the name of TelexFree, Inc., to account XXXXX5754, at Fidelity Co-operative Bank and in the name of Carlos Wanzeler, in the amount of $158,900 |
|---|---|---|
| 6 | 12/26/2013 | Wire transfer from account XXXXX3859, at Fidelity Co-operative Bank and in the name of TelexFree, Inc., to account XXXXX5754, at Fidelity Co-operative Bank and in the name of Carlos Wanzeler, in the amount of $22,700 |
| 7 | 12/27/2013 | Wire transfer, from account XXXXX3859, at Fidelity Co-operative Bank and in the name of TelexFree, Inc., to account XXX5999, at Waddell & Reed, Inc., and in the name of James Merrill, in the amount of $3,000,000 |
| 8 | 12/27/2013 | Wire transfer, from account XXXXX3859, at Fidelity Co-operative Bank and in the name of TelexFree, Inc., to account XXXXX5754, at Fidelity Co-operative Bank and in the name of Carlos Wanzeler, in the amount of $3,000,000 |
| 9 | 12/27/2013 | Wire transfer from account XXXXX3859, at Fidelity Co-operative Bank and in the name of TelexFree, Inc., to account XXXXX5754, at Fidelity Co-operative Bank and in the name of Carlos Wanzeler, in the amount of $3,500,000 |

All in violation of Title 18, United States Code, Section 1343.

## COUNTS TEN THROUGH SEVENTEEN

### (Engaging in Monetary Transactions in Property Derived
### from Specified Unlawful Activity - 18 U.S.C. § 1957(a))

39.     The Grand Jury realleges and incorporates by reference paragraphs 1-34 of this

Indictment, and further charges that:

40.     On or about the dates set forth below, in the District of Massachusetts and

elsewhere, the defendants,

### (1) JAMES MERRILL and
### (2) CARLOS WANZELER

knowingly engaged and attempted to engage in monetary transactions affecting interstate

commerce, in criminally derived property of a value greater than $10,000, that is, the transfer of

funds by, through, and to the financial institutions identified below, such property having been

derived from specified unlawful activity, that is, conspiracy to commit wire fraud and wire fraud,

as alleged in Counts 1 through 9 of this First Superseding Indictment:

| Count | Date | Monetary Transaction |
|-------|------|----------------------|
| 10 | 12/26/2013 | Wire transfer from account XXXXX3859, at Fidelity Co-operative Bank and in the name of TelexFree, Inc., to account XXXXX6876, at Middlesex Savings Bank and in the name of James Merrill, in the amount of $136,200 |
| 11 | 12/26/2013 | Wire transfer from account XXXXX3859, at Fidelity Co-operative Bank and in the name of TelexFree, Inc., to account XXXXX5754, at Fidelity Co-operative Bank and in the name of Carlos Wanzeler, in the amount of $500,000 |
| 12 | 12/26/2013 | Wire transfer, from account XXXXX3859, at Fidelity Co-operative Bank and in the name of TelexFree, Inc., to account XXXXX5754, at Fidelity Co-operative Bank and in the name of Carlos Wanzeler, in the amount of $136,200 |
| 13 | 12/26/2013 | Wire transfer, from account XXXXX3859, at Fidelity Co-operative |

|    |            | Bank and in the name of TelexFree, Inc., to account XXXXX5754, at Fidelity Co-operative Bank and in the name of Carlos Wanzeler, in the amount of $158,900 |
|----|------------|---|
| 14 | 12/26/2013 | Wire transfer from account XXXXX3859, at Fidelity Co-operative Bank and in the name of TelexFree, Inc., to account XXXXX5754, at Fidelity Co-operative Bank and in the name of Carlos Wanzeler, in the amount of $22,700 |
| 15 | 12/27/2013 | Wire transfer, from account XXXXX3859, at Fidelity Co-operative Bank and in the name of TelexFree, Inc., to account XXX5999, at Waddell & Reed, Inc., and in the name of James Merrill, in the amount of $3,000,000 |
| 16 | 12/27/2013 | Wire transfer, from account XXXXX3859, at Fidelity Co-operative Bank and in the name of TelexFree, Inc., to account XXXXX5754, at Fidelity Co-operative Bank and in the name of Carlos Wanzeler, in the amount of $3,000,000 |
| 17 | 12/27/2013 | Wire transfer from account XXXXX3859, at Fidelity Co-operative Bank and in the name of TelexFree, Inc., to account XXXXX5754, at Fidelity Co-operative Bank and in the name of Carlos Wanzeler, in the amount of $3,500,000 |

All in violation of Title 18, United States Code, Section 1957(a) and Title 18, United States Code, Section 2.

## FORFEITURE ALLEGATION

### (18 U.S.C. § 981(a)(1)(C) & 28 U.S.C. § 2461(c))

The Grand Jury further charges:

41.     Upon conviction of one or more of the offenses charged in Counts One through Nine of this First Superseding Indictment, the defendants,

**(1) JAMES MERRILL and
(2) CARLOS WANZELER,**

shall forfeit to the United States, jointly and severally, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, that constitutes, or is derived from, proceeds traceable to the commission of the offenses.   The property to be forfeited by the defendants includes, but is not limited to, the following:

a.     $6,152,341.44 payable to TelexFree LLC from cashier's check number 6597301168, issued by Wells Fargo Bank on April 11, 2014;

b.     $27,855.57 payable to TelexFree LLC from cashier's check number 6597301173, issued by Wells Fargo Bank on April 11, 2014;

c.     $16,970,714.14 payable to TelexFree LLC from cashier's check number 6597301169, issued by Wells Fargo Bank on April 11, 2014;

d.     $1,968,777.06 payable to TelexFree LLC from cashier's check number 6597301166, issued by Wells Fargo Bank on April 11, 2014;

e.     $429,120.31 payable to TelexFree LLC from cashier's check number 6597301167, issued by Wells Fargo Bank on April 11, 2014;

f.     $10,398,000.00 payable to TelexFree Dominicana SRL from cashier's check number 6647301103, issued by Wells Fargo Bank on April 3, 2014;

g.     $2,000,634.76 payable to Katia B Wanzeler from cashier's check number 6597301170, issued by Wells Fargo Bank on April 11, 2014;

h.     $50.03 payable to JC Real Estate Management Co from cashier's check number 6597300418, issued by Wells Fargo Bank on April 11, 2014;

i. $728.44 payable to JC Real Estate Management Co from cashier's check number 6597300715, issued by Wells Fargo Bank on April 11, 2014;

j. $74.91 payable to JC Real Estate Investment Co from cashier's check number 6597300416, issued by Wells Fargo Bank on April 11, 2014;

k. $3,798,629.63 payable to Carlos Wanzeler from cashier's check number 6647301104, issued by Wells Fargo Bank on April 3, 2014;

l. Approximately $34,615,900 seized from i-Payout/International Payout;

m. $4,561,874.25 seized from Pro Pay, Inc.;

n. $10,536,667.55 seized from Base Commerce LLC;

o. $98,419.02 seized from Bank of New England bank account number ***4031, held in the name of TelexFree LLC;

p. $421,115.17 seized from Commerce Bank account numbers ***0724 and ****1587, held in the name of Brazilian Help Inc.;

q. $129,087.84 seized from Digital Credit Union bank account number ****7922, held in the name of Above & Beyond the Limit LLC;

r. $10,643.00 seized from Middlesex Savings Bank account number *****8181, held in the name of Cleaner Image Associates;

s. $104,988.64 seized from Middlesex Savings Bank account number *****6876, held in the name of James Merrill and Kristin Merrill;

t. $2,487,204.68 seized from PNC Bank account number******1813, held in the name of TelexFree Financial, Inc.;

u. $601,608.61 seized from Wells Fargo Bank account number ******3387, held in the name of TelexFree Financial, Inc.;

v. $71,450.82 seized from Wells Fargo Bank account number ******4252, held in the name of TelexFree Financial, Inc.

w. All funds on deposit in Infinex Financial Group account number *****6844, held in the name of TelexFree LLC;

x. All funds on deposit in Infinex Financial Group account number *****1039, held in the name of TelexFree LLC;

y.    All funds on deposit in Massachusetts Financial Services account number ****_*******6997, held in the name of TelexFree LLC;

z.    All funds on deposit in Waddell & Reed, Inc., account number ****4903, held in the name of TelexFree LLC;

aa.    All funds on deposit in Waddell & Reed account number ****1090, held in the name of James Merrill and Kristin Merrill;

bb.    All funds on deposit in Waddell & Reed account number ****6892, held in the name of James Merrill and Kristin Merrill;

cc.    All funds on deposit in Wells Fargo Advisors LLC account number ****3207, held in the name of Katia H. Barbosa, a/k/a Katia Wanzeler;

dd.    Approximately $1,159,847.53 payable to TelexFree from 80 cashier's checks turned over to the United States on or about May 9, 2014;

ee.    $10,314 in United States currency seized on or about April 15, 2014 from 225 Cedar Hill Street, Marlborough, Massachusetts;

ff.    $6,030 in United States currency seized on or about April 18, 2014 from 373 Howard Street, Northborough, Massachusetts;

gg.    the real property located at 1 Coburn Drive, Ashland, Massachusetts, including all buildings, appurtenances, and improvements thereon, more fully described in a Quitclaim Deed recorded on December 12, 1997, with the Southern Middlesex Registry of Deeds, book 27970, page 143;

hh.    the real property located at 373 Howard Street, Northborough, Massachusetts, including all buildings, appurtenances, and improvements thereon, more fully described in a Deed recorded on May 1, 2013, with the Worcester District Registry of Deeds, book 50825, page 285;

ii.    the real property located at 462-464 Coburn Avenue, Worcester, Massachusetts, including all buildings, appurtenances, and improvements thereon, more fully described in a Quitclaim Deed recorded on March 25, 2013, with the Worcester District Registry of Deeds, book 50634, page 321;

jj.    the real property located at 30D Mount Avenue, Worcester, Massachusetts, including all buildings, appurtenances, and improvements thereon, more fully described in a Quitclaim Deed recorded on May 6, 2013, with the Worcester District Registry of Deeds, book 50845, page 304;

kk.    the real property located at 41-A Mount Avenue, Worcester, Massachusetts, including all buildings, appurtenances, and improvements thereon, more fully

described in a Deed recorded on October 4, 2002, with the Worcester District Registry of Deeds, book 27685, page 030;

ll.    the real property located at 63 Prospect Street, Worcester, Massachusetts, including all buildings, appurtenances, and improvements thereon, more fully described in a Quitclaim Deed recorded on August 30, 2012, with the Worcester District Registry of Deeds, book 49535, page 31;

mm.    the real property located at 2321 NW 37th Avenue, Coconut Creek, Florida, including all buildings, appurtenances, and improvements thereon, more fully described in a Warranty Deed recorded on November 3, 2003, with the Broward County Registry of Deeds, book 36354, page 498;

nn.    the real property located at 4506 San Mellina Drive, Coconut Creek, Florida, including all buildings, appurtenances, and improvements thereon, more fully described in a Special Warranty Deed, recorded on December 3, 2013, with the Broward County Registry of Deeds, book 50374, page 223;

oo.    the real property located at 1097 NW 82nd Terrace, Coral Springs, Florida, including all buildings, appurtenances, and improvements thereon, more fully described in a Special Warranty Deed recorded on January 6, 2014, with the Broward County Registry of Deeds, book 50454, page 1121;

pp.    the real property located at 5730 SW 36th Court, Davie, Florida, including all buildings, appurtenances, and improvements thereon, more fully described in a Warranty Deed recorded on July 2, 2013, with the Broward County Registry of Deeds, book 49946, page 1800;

qq.    the real property located at 476 NW 3rd Avenue, Deerfield Beach, Florida, including all buildings, appurtenances, and improvements thereon, more fully described in a Warranty Deed recorded on February 15, 2013, with the Broward County Registry of Deeds, book 49513, page 1047;

rr.    the real property located at 1708 NW 5th Street, Fort Lauderdale, Florida, including all buildings, appurtenances, and improvements thereon, more fully described in a Warranty Deed recorded on April 21, 2014, with the Broward County Registry of Deeds, book 50714, page 1351;

ss.    the real property located at 2390 NW 6th Court, Fort Lauderdale, Florida, including all buildings, appurtenances, and improvements thereon, more fully described in a Warranty Deed recorded on May 7, 2013, with the Broward County Registry of Deeds, book 49768, page 1616;

tt.    the real property located at 2780 NW 6th Court, Fort Lauderdale, Florida, including all buildings, appurtenances, and improvements thereon, more fully described in a

Warranty Deed recorded on May 7, 2013, with the Broward County Registry of Deeds, book 49768, page 1582;

uu.  the real property located at 411 NW 12th Avenue, Fort Lauderdale, Florida, including all buildings, appurtenances, and improvements thereon, more fully described in a Warranty Deed recorded on September 4, 2013, with the Broward County Registry of Deeds, book 50136, page 559;

vv.  the real property located at 642 NW 22nd Road, Fort Lauderdale, Florida, including all buildings, appurtenances, and improvements thereon, more fully described in a Warranty Deed recorded on July 24, 2013, with the Broward County Registry of Deeds, book 50013, page 393;

ww.  the real property located at 524 NW 10th Street, Hallandale, Florida, including all buildings, appurtenances, and improvements thereon, more fully described in a Warranty Deed recorded on June 17, 2013, with the Broward County Registry of Deeds, book 49896, page 636;

xx.  the real property located at 2740 NE 47th Street, Lighthouse Point, Florida, including all buildings, appurtenances, and improvements thereon, more fully described in a Warranty Deed recorded on November 6, 2012, with the Broward County Registry of Deeds, book 49222, page 1051;

yy.  the real property located at 208 SW 1st Court, Pompano Beach, Florida, including all building, appurtenances, and improvements thereon, more fully described in a Warranty Deed recorded with the Broward County Registry of Deeds on December 19, 2013, with the Broward County Registry of Deeds, book 50419, page 1817;

zz.  the real property located at 4260 NE 12th Terrace, Pompano Beach, Florida, including all buildings, appurtenances, and improvements thereon, more fully described in a Warranty Deed recorded on February 20, 2013, with the Broward County Registry of Deeds, book 49527, page 498;

aaa.  the real property located at 5316 NE 14th Avenue, Pompano Beach, Florida, including all buildings, appurtenances, and improvements thereon, more fully described in a Warranty Deed recorded on April 16, 2013, with the Broward County Registry of Deeds, book 49701, page 1736;

bbb.  the real property located at 167 NW 38th Street, Miami, Florida, including all buildings appurtenances, and improvements thereon, more fully described in a Warranty Deed recorded on July 25, 2013, with the Miami-Dade County Registry of Deeds, book 28740, page 985;

ccc.  the real property located at 175 NW 38th Street, Miami, Florida, including all buildings, appurtenances, and improvements thereon, more fully described in a

Warranty Deed recorded on July 25, 2013, with the Miami-Dade County Registry of Deeds, book 28740, page 985;

ddd. the real property located at 249 NE 55th Terrace, Miami, Florida, including all buildings, appurtenances, and improvements thereon, more fully described in a Warranty Deed recorded on May 9, 2013, with the Miami-Dade County Registry of Deeds, book 28621, page 4166;

eee. the real property located at 231 NW 57th Street, Miami, Florida, including all buildings, appurtenances, and improvements thereon, more fully described in a Warranty Deed recorded on March 28, 2013, with the Miami-Dade County Registry of Deeds, book 28552, page 4250;

fff. the real property located at 1553 NE 152nd Street, Miami, Florida, including all buildings, appurtenances, and improvements thereon, more fully described in a Warranty Deed recorded on February 7, 2013, with the Miami-Dade County Registry of Deeds, book 28479, page 1010;

ggg. the real property located at 900 38th Street, West Palm Beach, Florida, including all buildings, appurtenances, and improvements thereon, more fully described in a Warranty Deed recorded on March 6, 2013, with the Palm Beach County Registry of Deeds, book 25846, page 331;

hhh. all right, title and interest in a Note and Mortgage held by Acceris Realty Estate LLC in the amount of $284,214.66 secured by the real property located at 240 Union Street, Ashland, Massachusetts, including all buildings, appurtenances, and improvements thereon, more fully described in a Quitclaim Deed recorded on June 24, 2013 with the Southern Middlesex Registry of Deeds, book 62309, page 56. The Mortgage was recorded with the Southern Middlesex Registry of Deeds on June 24, 2013, book 62309, page 56;

iii. all right, title and interest in a Note and Mortgage held by Acceris Realty Estate LLC in the amount of $193,000 secured by the real property located at 216 West Union Street, Ashland, Massachusetts, including all buildings, appurtenances, and improvements thereon, more fully described in a Quitclaim Deed recorded on December 13, 2013 with the Southern Middlesex Registry of Deeds, book 63057, page 122. The Mortgage was recorded with the Southern Middlesex Registry of Deeds on December 13, 2013, book 63057, page 126;

jjj. all right, title and interest in a Note and Mortgage held by Above & Beyond the Limit, LLC in the amount of $308,750 secured by the real property located at 3460 Greenview Terrace, Margate, Florida, including all buildings, appurtenances, and improvements thereon, more fully described in a Warranty Deed recorded on December 9, 2013 with the Broward County Registry of Deeds, book 50390, page 774. The Mortgage was recorded with the Broward County Registry of Deeds,

book 50390, page 776;

kkk.   one 2014 BMW X6 bearing vehicle identification number 5UXFG2C53E0C43173 and Massachusetts registration 312HL4;

lll.   one 2013 BMW X5 bearing vehicle identification number 5UXZV4C59D0E13307 and Massachusetts registration 918VS4;

mmm.   one 2013 BMW Z4 bearing vehicle identification number WBALL5C53DJ103886 and Massachusetts registration 376VK8;

nnn.   one 2009 Ferrari 430 bearing vehicle identification number FFEW59A290167021 and Florida registration CAML43;

ooo.   one 2013 Porsche Boxster bearing vehicle identification number WP0CA2A80DK112074 and Massachusetts registration 626RJ2;

ppp.   one 2013 Toyota Highlander bearing vehicle identification number JTEDC3EH3D2013050 and Massachusetts registration 3WYE70; and

qqq.   one 2007 Sea Ray 40 Motor Yacht, bearing hull number SERP7118K607; and

rrr.   one 2003 Maxum boat, bearing hull number MXYA46MVD303.

42.   If any of the property described in paragraph 41 as being forfeitable pursuant to 18

U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), as a result of any act or omission of the defendants:

a.   cannot be located upon the exercise of due diligence;

b.   has been transferred to, sold to, or deposited with a third party;

c.   has been placed beyond the jurisdiction of this Court;

d.   has been substantially diminished in value; or

e.   has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to 28 U.S.C. § 2461(c), incorporating 21 U.S.C. §

853(p), to seek forfeiture of all other property of the defendants up to the value of the property

described in paragraph 41 above, including, but not limited to:

a.   the real property located at 655 Plantation Street, Unit 17B, Worcester,

24

Massachusetts, including all buildings, appurtenances, and improvements thereon, more fully described in a Unit Deed recorded on December 23, 2004, with the Worcester District Registry of Deeds, book 35377, page 218;

b.      the real property located at 59 Pleasant Street, Clinton, Massachusetts, including all buildings, appurtenances, and improvements thereon, more fully described in a Quitclaim Deed recorded on May 6, 2013, with the Worcester District Registry of Deeds, book 50845, page 301; and

c.      the real property located at 149 Barnard Road, Worcester, Massachusetts, including all buildings, appurtenances, and improvements thereon, more fully described in a Quitclaim Deed recorded on May 6, 2013, with the Worcester District Registry of Deeds, book 50845, page 303.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States

Code, Section 2461(c).

## MONEY LAUNDERING FORFEITURE ALLEGATION

### (18 U.S.C. § 982(a)(1))

The Grand Jury further charges that:

42.     Upon conviction of one or more of the offenses alleged in Counts Ten through Seventeen of this First Superseding Indictment,

### (1) JAMES MERRILL and
### (2) CARLOS WANZELER,

defendants herein, jointly and severally, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in the offenses, and any property traceable to such property.   The property to be forfeited includes, but is not limited to, a sum of money equal to the total amount of money involved in the offenses, which may be entered in the form of a joint and several forfeiture money judgment.

43.     If any of the property described in paragraph 42 above, as a result of any act or omission of the defendants,

        a.     cannot be located upon the exercise of due diligence;

        b.     has been transferred or sold to, or deposited with, a third party;

        c.     has been placed beyond the jurisdiction of the Court;

        d.     has been substantially diminished in value; or

        e.     has been commingled with other property which cannot be subdivided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b)(1), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in paragraph 42.

All pursuant to Title 18, United States Code, Section 982(a)(1).

A TRUE BILL,

_____
FOREPERSON OF THE GRAND JURY


_____
ANDREW E. LELLING
NEIL J. GALLAGHER, JR.
Assistant U.S. Attorneys


DISTRICT OF MASSACHUSETTS,
Returned into the District Court by the Grand Jury Foreperson and filed on September 8, 2016.

_____
Deputy Clerk

12:48 P.