UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA | ] | | |
| | ] | No. | 14-CR-40028-TSH |
| v. | ] | | |
| | ] | | |
| JAMES MERRILL | ] | | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

# **Table of Contents**

**INTRODUCTION**................................................................................................1

**FACTUAL BACKGROUND**...............................................................................2

**I.** It Was Obvious From the Beginning –
Including to Merrill – That Telexfree Was a Pyramid Scheme  .................................3

    **A.** There is No Question that James Merrill Ran TelexFree
and Had Routine Access to All Information Required
to Know the Truth about its Operations  ...........................................9

        **1.** Merrill Publicly, Actively Led TelexFree, Through the
Web Site and Personal Appearances  ...........................................9

        **2.** Merrill Controlled TelexFree's Bank Accounts and
Had Access to TelexFree's Business Records,
Staff, and Participants.................................................................13

    **B.** Despite His Own Knowledge and Repeated Warnings
from Others, Merrill Lied to TelexFree's Participants
From Start to Finish ......................................................................14

**II.** Telexfree Destroyed the Lives of Thousands of People
in Dozens of Countries  .......................................................................19

    **A.** TelexFree's Business Data Reveals Staggering Victim
Losses Spanning Every U.S. State and Most Foreign Countries  .................19

    **B.** Victim Impact Statements and Interviews Corroborate the
Damage Implied by the Business Data ............................................23

**SENTENCING CALCULATION AND RESTITUTION**....................................27

**I.** The Probation Officer's Sentencing Calculation is Correct............................27

    **A.** The Amount of Loss (+30 Levels)  ..............................................27

    **B.** Merrill's Role in the Offense (+4 Levels)  ....................................27

    **C.** Substantial Hardship to More Than 25 People (+6 Levels)  ............29

    **D.** Sophisticated Means (+2 Levels) ...............................................29

**II.** Merrill Deserves Ten Years in Prison, But He Does Not Deserve More, so The Court Should Accept the Pending Rule 11(c)(1)(c) Plea Agreement ......................................................................30

**III.** The Government Anticipates Distributing Seized Telexfree Assets to Victims Through the Verified Claims Procedure Administered by the Chapter 11 Bankruptcy Trustee ...............................................................................32

    **A.** The Court Has Discretion to Fashion a Practical Approach to Restitution ................................................................34

    **B.** The Government Will Seek Permission to Transfer Forfeited Assets to the Bankruptcy Trustee for Distribution to TelexFree Victims Through the Bankruptcy Claims Process ...........................................................36

    **C.** The Government Will Submit a Proposed Order to the Court on Restitution ................................................................37

**CONCLUSION** ...............................................................................................**38**

The United States hereby submits its memorandum in support of its position at sentencing in this case.

## INTRODUCTION

Between February 2012 and April 2014, James Merrill was the public leader of a global pyramid scheme in which 1,887,000 people, from over a 100 countries, lost $3,045,000,000. These figures are not an estimate, extrapolation or prediction – TelexFree's business records preserved every transaction by every person who ever invested in the company.  These are real dollars, lost by real people, who trusted the TelexFree system and invested, in many cases, their life savings.  It is not an exaggeration to say that Merrill and co-defendant Carlos Wanzeler destroyed the lives of thousands of people the world over.

Merrill understood and helped design TelexFree's compensation system; helped explain and promote it to investors; ran the company day-to-day; controlled all of the bank accounts; and exhorted more and more people to sign up.  But he knew from the beginning about the risks of pyramid schemes and – more importantly – the flaws in TelexFree's compensation system.  Even in the face of mounting customer concerns, lawyers' warnings, legal challenges, and government investigations, Merrill continually lied, affirmatively and by omission, to the millions of investors who trusted him.  Meanwhile, he paid himself over $4,500,000.

Merrill insists that, within TelexFree, he made the right noises at the time and urged better compliance, but his co-founders refused to make changes.  But throwing up his hands and saying, "What could I do?" is a weak excuse for two years of moral failure:  the bottom line is that James Merrill was in charge of the daily operations of TelexFree and managed to never do the one thing that would have counted – warn the public – because that would have hurt the business.  Nor could

he even muster the fortitude to just walk out and quit.  Instead, he rode TelexFree until the end, profiting on the backs of investors.

In April 2014 TelexFree collapsed, owing about $6,000,000,000 to about 2,000,000 people. Just a few weeks before, company lawyers had asked Merrill if TelexFree had enough money to pay investors.  By this point Merrill had run TelexFree for two years, controlled the bank accounts, and received months of stark warnings that TelexFree was a pyramid scheme.  His response to the inquiry?  "I do not know, but I certainly hope so."[1]  Meanwhile, in December 2013 he had wired $10,000,000 to himself and his two co-conspirators.

Merrill deserves 10 years in prison.  That sentence is well below what would normally be reasonable for leading the largest pyramid scheme ever prosecuted by the U.S. Department of Justice.  Were it not for Wanzeler's greater role, Merrill's belated efforts to fix TelexFree's problems, and his agreement to provide information to U.S. and Brazilian investigators, the government's recommendation would be far higher.

## FACTUAL BACKGROUND RELEVANT TO SENTENCING

A vast amount of evidence was developed in this case, but key aspects of it highlight why Merrill deserves a significant prison term.  Merrill knew from the beginning that TelexFree was not a legitimate enterprise and yet chose to promote and profit from it.  His defense amounts to insisting that he just could not do anything about it and it really bothered him at the time.  But James Merrill wasn't in MS-13.  He was running a company in Marlborough.  Nothing, beyond greed, prevented him from warning TelexFree's investors or quitting.  In essence, Merrill's defense

---

[1] *See Government Exhibit Binder* ("Govt Binder") at Tab 1.  The government will provide this binder separately to the Court and ask that it be made part of the record at sentencing.

is that he lacked the courage of his own convictions, *i.e.*, because he worried at the time that he was committing a fraud, it's okay that he was committing a fraud.

## I.    IT WAS OBVIOUS FROM THE BEGINNING – INCLUDING TO MERRILL – THAT TELEXFREE WAS A PYRAMID SCHEME

Soon after it was founded, it was obvious to someone in Merrill's position that TelexFree was a pyramid scheme.  This point is important to understanding Merrill's culpability.  Putting aside the bells, whistles, and various complexities of how TelexFree paid its participants, at bottom it worked like this:  If someone paid TelexFree $339 and spent five minutes a day posting classified ads on sites provided by TelexFree, they would be paid $20 per week, that is, a guaranteed $1040 a year.  If someone paid TelexFree $1425 and posted the ads, they would be paid $100 per week, that is, $5200 a year.  This is a return of over 200%, and to earn it the participant was not required to sell anything.  Moreover, as Merrill knew, participants could own multiple accounts, thus compounding their returns.  Consequently, because TelexFree was not generating revenue from selling its product (the VOIP phone service), these participants could only be paid with funds received from later participants.  That's a Ponzi scheme.  Since TelexFree also paid participants for recruiting other participants (again without selling anything) it was also a pyramid scheme.[2]

These conclusions are not based on some painstaking exegesis of TelexFree's records. Merrill and Wanzeler openly advertised TelexFree this way.  For example, the web site announced the following:

---

[2]  On the definition of a pyramid scheme, see, *e.g.*, *In re Koscot Interplanetary, Inc.* 86 F.T.C. 1106 (1975) (seminal FTC decision defining a pyramid scheme); *United States v. Gold Unlimited, Inc.*, 177 F.3d 472, 479-80 (6th Cir. 1999) (discussing pyramid scheme characteristics, noting use of initial buy-in fees, instead of product sales, to generate revenue); *Webster v. Omnitrition Int'l, Inc.,* 79 F.3d 776, 788 (9th Cir. 1996) (describing profit through recruitment instead of product sales, including ongoing recruitment by one's own initial recruits, as the *sine qua non* of pyramid schemes).

**Be our promoter**
**Earn money doing announcements on Internet!**
Through a ADCENTRAL, that you get for the amount of US$299 (annually).

The promoter will receive US$20 each week that makes 7 different announcements in websites of free announcements online, from Monday to Sunday. **All in a way fast, easy, and standardized in your virtual office (BO) Telexfree.**

This will be for the 52 weeks of the year, of your contract, then see the simulation:

**52 weeks x $20 (Putting the 7 announcements) = $ 1,040 in the year**

*Govt Binder* Tab 2 (archived site page; all emphasis in original).

Merrill understood the compensation structure perfectly.  In fact, he helped design and explain it.  For example, TelexFree's website home page contained the following banner:



*Govt Binder* Tab 3 (archived home page).

Clicking the link led to a PowerPoint presentation summarizing TelexFree's compensation structure in very simple terms.  The slides were designed to help TelexFree participants recruit other people, and most of the TelexFree victims interviewed by the government had seen the PowerPoint in some form.  As Merrill admitted to the Massachusetts Securities Division in a deposition, he knew it was used for this purpose.  *See MSD Deposition (3/28/14)* at 120-21 (transcript at Tab 4 of Government Binder).

4

Slide Three of an early version of the PowerPoint says this:



*Govt Binder* Tab 5 (entire presentation).  Later slides then helpfully did the math on the impressive yearly returns TelexFree offered, complete with charts.  *Id*.  Later versions of the PowerPoint were more discrete, removing the "make money without selling anything!" slide, but the plan and charts were identical.

Merrill reviewed and revised PowerPoint content.  For example, in January 2013, Merrill discussed the PowerPoint, slide by slide, with TelexFree's attorney.  He then tasked Wanzeler with getting the changes onto the web site (which happened).  *See Govt Binder* at 6.  Similarly, over time Merrill revised aspects of the PowerPoint, sometimes in conjunction with his marketing manager, Steve Labriola.  *See id*. (2/6/13 email to Labriola with attached revision of PowerPoint, telling Labriola to "review it with your team" and opining that "we can start using it").

Merrill also repeatedly explained the compensation plan to others.  In mid-2012, Merrill wrote for TelexFree's attorney a lucid three-page summary of TelexFree's compensation plan; in December 2012, Merrill explained and debated the compensation plan with Ryan Mitchell, the VOIP engineer; in August 2013, Merrill sent TelexFree's new attorney a lucid two-page summary

of the compensation plan, a copy of the recruiting PowerPoint, and TelexFree's terms and conditions of use; and, more generally, Merrill routinely debated the plan with staff and outside consultants. *See Govt Binder* at Tab 7 (emails and attachments).

And yet, when deposed by the Massachusetts Securities Division in March 2014, Merrill asserted that he was not familiar with the compensation plan and that Wanzeler was really the guy who understood all that stuff. *See, e.g., MSD Deposition* at 68 ("the comp plan is not my area but I can give you a basic overview of the program") (*Govt Binder* at Tab 4). Yet, Merrill went on to explain the program in detail, including walking through his PowerPoint presentation. *Id*. at 68-79; 138-43.

Merrill also knew – from the start – that TelexFree paid a <u>90%</u> commission on each VOIP sale. That is, if a participant actually sold the company's VOIP plan for $49.90, TelexFree paid the participant a 90% commission. Merrill also knew that nothing stopped every TelexFree participant from simply selling a VOIP plan to <u>himself</u> to meet the requirement that participants "sell" at least one plan. *See, e.g., MSD Deposition* at 139 ("Q.: And could you be your own customer? A: I could be my own customer.") (*Govt Binder* at Tab 4.) This, as Merrill knew, is a classic pyramid scheme red flag: on paper, company sales look enormous, as every participant "sells" the product to himself so they can then qualify for other bonuses.[3] But no one actually uses the product, which is secondary to the chance to make money posting ads and recruiting others. Of the 12,400,000 or so VOIP plans TelexFree "sold," 97% of them never registered even a <u>minute</u> of use.

---

[3] *See, e.g., In re Koscot Interplanetary, Inc.* 86 F.T.C. 1106 (1975); *Webster v. Omnitrition Int'l, Inc.,* 79 F.3d 776, 788-90 (9th Cir. 1996).

Merrill insists that – despite all of the above – he did not know TelexFree was a pyramid scheme, that is, he did not know that TelexFree could only pay current participants by using money from newly-joined participants, because the 90% VOIP sales commission created a strong incentive to actually sell product, as opposed to just posting ads and/or recruiting others.  This is false, and obviously so:  given the choice between (a) a guaranteed passive income of $100 a week (over 200% a year) and (b) a $45 commission for convincing someone to buy a VOIP plan, everyone will pick the passive return.  This is not a guess; once again TelexFree's own business records give the answer:  breaking down every participant's account by source of income, that is, separating out commissions from ad-posting, bonuses for recruiting others, and commissions from actually selling the VOIP product, we see the following:



That is, of the approximately $6,000,000,000 in commissions and bonuses earned by TelexFree participants, 4.3% was attributable to selling a VOIP plan ("VoIP Commissions"), and the other 95.7% was attributable to ad-posting commissions and recruitment bonuses that required no sales.  In short, apparently it was obvious to everyone except James Merrill that the best way to make money with TelexFree was to get paid for doing nothing, as opposed to getting paid for hawking phone plans.

TelexFree's own staff told Merrill this.  In 2012, TelexFree hired an engineer, Ryan Mitchell, to help set up the VOIP system.  During a meeting in Brazil in 2012, he listened to Merrill's and Wanzeler's description of TelexFree's business plan and asked them how a company can survive if it takes in $1,425 (payment to join TelexFree) but then pays out $5,200 a year? Mitchell followed up by email, warning Merrill about the compensation plan:

> I had a good meeting with Costa the other day.  I think he's a good guy, and I can tell he is smart.  I still have concerns about the finances.
>
> What is our customer acquisition cost?  What is the liability per customer?  What is the expected revenue/value per customer over 12 months?  What are our current total liabilities?
>
> If you can't answer these simple questions, there's either something wrong with the business, or everybody is eating bullshit!!

See Govt Binder at Tab 8 (series of emails, Dec. 7-10, 2012).  Mitchell went on to note that the money TelexFree was required to pay in commissions and bonuses was far higher than incoming revenue from product sales.  Id.  In response, Merrill acknowledged what now says he never knew about his own company:

> Yes that is the plan [to grow the network and then lower commissions to create positive cash flow for the company].  One additional item is to make sure not all our revenue is from startup fees.  If all the revenue is from agent start up fees and we pay agents without them acquiring customers, we would be in trouble.

Id.[4]  Hammering home the point, Mitchell replied by reminding Merrill that, so far, people have made "millions" with TelexFree while selling almost nothing:

> Yes, obviously.  Considering that we have a variety of agents that have earned millions with very little actual product sold, that makes X (the average liability per agent) a big negative for us (multiplied by 300 thousand agents = a big debt). . . .

---

[4]   This echoed explicit warnings from TelexFree's lawyer the month before, who told Merrill that "stuff needs to really get bought and sold – it cannot be just the movement of money – that is where Zeek failed."  See Govt Binder at Tab 26 (11/15/12 email from Gerry Nehra to Merrill).  Zeek Rewards was an earlier pyramid scheme that resulted in a federal prosecution in North Carolina.

> So be prepared to know that each agent must bring in a lot of product sales to make
> up for everything.

*Id.* (emphasis added).  This is in <u>2012</u>.  Over the next two years, Mitchell was proven prescient:

when TelexFree crashed in April 2014 it owed its participants over $6,000,000,000 – "big debt"

indeed.  Had Merrill done something in 2012, this would not have happened.  Had Merrill quit the

company (instead of lying to investors and paying himself $4,500,000), he would not be culpable.

### A.     There is No Question that James Merrill Ran TelexFree and had Routine <u>Access to All Information Required to Know the Truth about its Operations</u>

James Merrill ran TelexFree's daily operations and had ready access to all information

needed to understand what made it run.  To say that he was somehow oblivious to TelexFree's

problems is implausible.

#### 1.     *Merrill Publicly, Actively Led TelexFree, Through the Web Site and Personal Appearances*

Merrill was the very pubic face of TelexFree and the acknowledged leader of the company.

The web site alone shows this.  It prominently displayed Merrill at the head of TelexFree,

portraying him to TelexFree's predominantly working class, immigrant participants as a rich,

white businessman.  This kind of photograph was typical:



*See Govt Binder* at Tab 9 (archived page with Merrill biography).  The caption to this photo reads,

"Arriving at the company for one more day of work."  (Though Merrill doesn't own the Hummer;

9

it belongs to Wanzeler.)  Other photos were intended to misrepresent the size and stability of the company to site visitors:



*Id*.  The caption to this photo says Merrill is standing before TelexFree's headquarters in the United States.  But not really – TelexFree rented one office in the lower right hand corner of the first floor.

Similarly, as noted above, the site's home page invited visitors to review a "business opportunity" presented by "Mr. Merrill.  In later versions, this graphic too invited participants to get rich with TelexFree:



Merrill could influence the web site's content when needed.  He insists now that he was helpless to change the site because it was maintained by programmers in Brazil, but this is misleading.  For example:

- As noted above, in January 2013, Merrill dictated changes to the recruiting PowerPoint maintained on TelexFree's site.  *See Govt Binder* at Tab 6.

- That same month, Merrill forwarded to Costa and Wanzeler a draft of terms and conditions for TelexFree and told them to "please make sure" it was posted to the web site with a link to the compensation plan.  *See id*. at Tab 10.

- In February 2013, Merrill revised an announcement about contract changes that had been drafted by Wanzeler and Costa and told a subordinate (Labriola) to call Wanzeler to clarify certain terms.  *See id*. at Tab 10 (2/8/13 email to Steve Labriola).[5]

- In July 2013, TelexFree's attorney at that time, Gerry Nehra, told Merrill to change the description of Nehra on the web site because Nehra was getting too many inquiries from outside the United States.  Merrill told Wanzeler, Costa, and TelexFree staff to make the change, and the change was made.  *See id.* at Tab 10 (7/16/13 email from Merrill).

- In March 2014, Merrill demanded that the picture of a major TelexFree promoter be removed from the site because the promoter had previously been sanctioned by the SEC.  The picture was removed.

- On March 28, 2014, the Massachusetts Securities Division questioned Merrill about lying on the TelexFree web site about graduating from college (he did not graduate).  *MSD Deposition* at 86 (*Govt Binder* at Tab 4).  Merrill protested that he had no control over the site.  *Id.*  Yet the biography language was changed days later.  *See Govt Binder* at Tab 11 (site page before (March 22, 2014) and after (April 4, 2014) MSD deposition).

Merrill's public leadership did not stop at the web site.  In one of the most disturbing aspects of TelexFree's operations, the company regularly hosted investor "extravaganzas" to promote TelexFree and celebrate the wealth it generated.  These weekend events had an

---

[5] "I made some changes but it still sucks. Adjustments not changes what does that mean.  Call Carlos and ask about the price either I don't understand something or it has two different prices for the family. It is so embarrassing when this goes up on the at site."

evangelical air, as Merrill strode onto the stage to the tune "Eye of the Tiger," and urged the crowd to do the wave.



Merrill and Wanzeler told the crowds that TelexFree would change their lives.   Wanzeler sometimes cried.   Successful promoters came on stage and received out-sized checks for millions of dollars:



Among TelexFree's participants Merrill was a celebrity, occasionally mobbed by the crowd when he appeared:



> **2.**     ***Merrill Controlled TelexFree's Bank Accounts and Had Access to TelexFree's Business Records, Staff, and Participants***

Merrill controlled TelexFree's bank accounts – a bell-weather fact in any fraud case. TelexFree had 32 accounts.  Merrill was the signatory, sometimes with others, on 30 of them.  *See Govt Binder* at Tab 12 (schedule of accounts).   He received the statements at his office in Marlborough.  If he wanted to know where TelexFree's revenue was really coming from, all he had to do was read them.  Similarly, Merrill negotiated and controlled TelexFree's accounts with its payment processors (third party companies that processed credit card and bank transfers for TelexFree).  *See id*. at Tab 13 (schedule of processors).

Moreover, in yet another warning sign, starting in May 2013 banks repeatedly shut down TelexFree's accounts because of suspicious activity.  *See id*. at Tab 14 (schedule of bank account closures).  Merrill was notified each time this occurred, after which he re-opened the accounts elsewhere.

Merrill also had ready access to data showing how many people, in a given time frame, were using TelexFree's phone service.  *See id*. at Tab 15 (email exchange with Ryan Mitchell in which Merrill requests, and receives, phone usage data).  Merrill also had ready access to SIG, a

Portuguese acronym for TelexFree's electronic database logging all participant activity. SIG was designed in Brazil and written in Portuguese. But Merrill had user access to SIG and, more importantly, several of his employees in Marlborough used SIG every day and were native Portuguese speakers. Merrill was <u>the President of the company</u>. All he had to do if he wanted information about TelexFree's investors was task them with collecting it.

Similarly, if Merrill wanted to independently confirm whether participants were really selling VOIP plans – as opposed to relying on income from ad-posting and recruitment – <u>all he had to do was ask them</u>. He had ready access to all of TelexFree's major participants, both directly and through his marketing manager. Several regularly visited TelexFree's offices; Merrill saw them at TelexFree "extravaganzas"; the office fielded queries from them every day; and all were reachable by phone and email.

But Merrill never asked. After TelexFree collapsed, these participants told the government they recruited hundreds of people, paid others to post ads for them every day, made millions, yet sold no VOIP and sure didn't know anyone who did. If they told all this to federal agents, they would have told James Merrill.

### B. Despite His Own Knowledge and Repeated Warnings from Others, Merrill Lied to TelexFree's Participants From Start to Finish

Merrill's protestations that he was trying to do the right thing in a tough situation – that he was simply "outvoted," as he described it to TelexFree's lawyer – are belied by the fact that, affirmatively and by omission, Merrill simply lied to TelexFree's participants for two years. As noted above, from late 2012 Merrill knew the company had problems, both because he understood the compensation system and because people told him. And while he may have wrung his hands privately, he did nothing publicly.

Quite the reverse. Consider:

14

In April 2013, the Massachusetts Securities Division began investigating TelexFree as a possible pyramid scheme.  In May 2013, a major bank (Bank of America) shut down TelexFree's accounts for suspicious activity and, through TelexFree's lawyer, Merrill began getting anxious queries from the field about whether TelexFree was legitimate.[6]  In June 2013, the Brazilian government shut down TelexFree and seized the equivalent of about $360,000,000.  Merrill's response to all this?  In a public conference call with TelexFree participants on June 20, 2013, he assured everyone that everything was fine, minimized the import of Brazil, omitted that TelexFree was already under investigation in the United States, and ignored the warning signs he himself had been aware of since 2012:

> Hello everybody and I really appreciate everybody getting on this call and we understand your concerns. We are always here to work on your behalf. But what Carlos said is very – very true.  We – whatever, you know – we feel like things will work itself out in Brazil, but in the U.S., it does not affect the U.S. market. It's – we're still growing like crazy thanks to your efforts, okay?
>
> Inquiries like this are very common in network marketing.  I believe in Brazil, there were – there's still some issue with Herbalife, Amway has had its challenges here in the U.S.  We've had such unbelievable growth that we're going to draw attention. And we have some of the best legal minds on this in Brazil.
>
> Again, nothing will affect the U.S. Please continue your – your dedication. This company will persevere, okay?  And again, thanks everybody for being on this call. We will – we're getting back to work now on your behalf. Thanks again.

*See Govt Binder* at Tab 16 (transcript).

Similarly, sticking to the theme that regulators were suspicious merely because TelexFree was a fast-growing company, in August 2013 Merrill's marketing manager, Steve Labriola, told

---

[6]  For example, in May 2013, TelexFree counsel received a complaint from a Florida resident who compared TelexFree to a company the SEC sued in August 2012 called "Zeek Rewards."  Counsel forwarded the email to Merrill and wrote, "I am on board to defend a program that sells long distance to customers. . . no mention of that below."  In June 2013, counsel forwarded yet another complaint that TelexFree was operating as an illegal Ponzi/pyramid scheme. In the email counsel asked Merrill, "Continued payment of commissions requires customer sales – does it not?" Merrill responded by saying (despite all evidence to the contrary) that the "incentive to sell [the TelexFree product] was "strong."

participants in a conference call that being shut down by banks was "really exciting" because it meant TelexFree was "growing fast." *See id*. at Tab 17 (transcript).[7]  Labriola got this from Merrill and relayed it publicly.  Months later, in March 2014, Labriola publicly announced that there was no investigation of TelexFree and that "nothing [was] going on."  *See id*. at Tab 18 (transcript). This was seven months after TelexFree's lawyers directly warned Merrill that TelexFree was a pyramid scheme, and one month after the MSD subpoenaed Merrill and Wanzeler to testify – a development TelexFree's lawyer, on February 5, 2014, told Merrill was "a serious escalation."[8] Again, Labriola wasn't freelancing; he discussed this with Merrill, who told him that it was "normal" for multi-level marketing companies to get those kinds of government inquiries.

In the period following the Brazil shutdown in June 2013, the warnings became more urgent, and so Merrill's deception more stark.  In July 2013, TelexFree hosted an "extravaganza" in Newport Beach, California.  From the stage Merrill was upbeat, telling the crowd how "the big corporations" feared TelexFree and the power of "network marketing."  No mention of problems with the company.  Following the conference, TelexFree's lawyer was deluged with emails asking if TelexFree was legal.  Alarmed by what he saw in these emails, the lawyer begged Merrill to stop taking in new money.  On July 29, 2013, the lawyer received an email from a participant who had invested $12,000.  He forwarded the email to Merrill and asked,

> How does someone put $12,000 in? not what I approved . . . if the train is about to go off the tracks . . . put the brakes on – now . . . this firm can only defend a business model that sell a service to customers that are using the service . . . I strongly recommend you track and post on your web site – Your ACTIVE customer activity.

---

[7]  "Now, the exciting thing is that it's happening because we're growing so fast and doing so many transfers and it's – I'm tickled."

[8]  "This is not good and is an escalation.  This is serious and not just a formality."  *Govt Binder* at Tab 19 (2/5/14 email from TelexFree counsel to Merrill and others).

Days later, on July 30, 2013, he forwarded another email to Merrill, with the following warning:

> Something is very wrong.  Please take my name and picture off of the web site.
> I have asked for customer numbers – none have been provided.
> . . . .
> If the train is going off the tracks – STOP THE TRAIN
> You could be days from a regulatory shut-down
> Yes – you stop momentum – but you save the company
>
> One suggestion – accept NO MORE NEW REPS in August
> Until the existing reps produce the active customers needed to right the ship

*See Govt Binder* at Tab 20 (emphasis in original).  Merrill responded by suggesting that the issues were being planted by a "competitor," and said TelexFree really did have customers.  He appears to have never considered, even for a moment, stopping the torrent of new investors.

The lies continued, as hundreds of thousands of people continued to sign up.  For example, on November 5-6, 2013, TelexFree hosted a corporate event in Orlando, Florida.  By this point, the drumbeat of warnings had culminated in not one, but two, lawyers telling Merrill point blank that TelexFree was a pyramid scheme.  Yet from the stage Merrill publicly dismissed rumors that the company was a pyramid scheme as uninformed bluster from competitors and blogs.  He told the crowd to "trust and believe" in Merrill and Wanzeler:

> I hate to bring up a negative, but it's important. Because negatives get turned into positives. We have plenty of blogs out there that, you know, don't – don't always speak kindly about us, they don't know us. But we know what they're about. They want you guys to go on their website and your competitors will go on their website, drawing traffic that will help them earn a living. I don't blame them. It's business. But what a difference is between you people is trust and belief in what we're doing, and I thank you all for believing in us and helping us get to that next level.

*See Govt Binder* at Tab 21 (transcript; emphasis added).  This assurance was garbage.  By this point Merrill knew TelexFree was a ticking bomb – a term used by TelexFree's own lawyers.

As another example, at some point in late 2013 Merrill signed a letter on TelexFree letterhead that said the following:

17

> TelexFree's business model has been fully reviewed and recognized by third-party experts as having an acceptable business model as per US guidelines for DS/MLM type of business. However, the company has been working diligently on re-launching with a new business model that will be provide a clearer Direct Sales benefit outline to its affiliates and comply with the strictest of US and international guidelines of MLM businesses by consulting with highly knowledgeable marketing, legal, and compliance professionals.

*See Govt Binder* at Tab 22 (signed letter, without addressee; emphasis added).  While it's unclear who received this letter or if it was sent, its central claim is a lie.  By the Fall of 2013, TelexFree had been shut down in Brazil, was under investigation by the State of Massachusetts, and Merrill had been told by two separate lawyers that the company was a pyramid scheme – a state of affairs he had begun to address by hiring an outside consultant.  Thus, no, the "business model" certainly had not "been fully reviewed and recognized by third-party experts" as legitimate.

Merrill did something similar on December 3, 2013, when he certified to a potential vendor, under oath, that

> in all countries Telex FREE, Inc. provides service to, as of the date of this correspondence, we are not in violation of any of those country's laws with respect to telephony services.

*See id.* (letter dated 11/27/13 to Brian Struzik).  It's possible that this was technically true; note the clause limiting the assurance to law concerning "telephony services."  But, as above, overall the assurance in this letter is a lie.

Later that month, on December 26-27, 2013, Merrill wired $10,000,000 from TelexFree's account at Fidelity Bank, keeping $3,000,000 for himself and transferring $7,000,000 to Carlos Wanzeler and Carlos Costa.  This made Merrill's total take from TelexFree about $4,500,000:

| Date | Source of Funds | Description | Amount |
|---|---|---|---|
| 05/17/12 to 08/15/12 | Unknown | Deposits to Merrill's Personal Bank of America account (8701) | $249,582 |
| 02/04/13 | Check drawn on Wanzeler's Personal account at Bank of America (1826) | Deposit to Merrill's Personal Bank of America account (8701) | $865,000 |
| 06/11/13 | Check drawn on Wanzeler's Personal account at Citizens Bank (111-3) | Deposit to Merrill's Personal Citizens Bank account (125-3) | $290,000 |
| 12/26/13 | Wire transfer drawn on Telexfree's account at Fidelity Bank (3859) | Wire transfer to Merrill's Personal Middlesex Savings account (6876) | $136,200 |
| 12/27/13 | Wire transfer drawn on Telexfree's account at Fidelity Bank (3859) | Wire transfer to Merrill's Personal Waddell & Reed account (5999) | $3,000,000 |
| | | | $4,540,782 |

A few months later, in April 2014, TelexFree filed for bankruptcy, essentially hiding in plain sight the collapse of a massive pyramid scheme that, by the end, owed its participants more money than the GDP of several third world countries.

## II.   TELEXFREE DESTROYED THE LIVES OF THOUSANDS OF PEOPLE IN DOZENS OF COUNTRIES

It is nearly impossible to exaggerate the damage caused by Merrill's and Wanzeler's fraud. TelexFree spread like a virus. Ironically, the very aspect of "network marketing" they promoted – that the company would thrive because each participant would not only sell VOIP but would recruit others to do it as well – was what led thousands of people to ruin the lives of their families, friends and colleagues. Each participant eagerly recruited his or her loved ones and acquaintances with the assurance that, if they just posted their ads each day, they'd make $1040 or $5200 a year.

### A.   TelexFree's Business Data Reveals Staggering Victim Losses Spanning Every U.S. State and Most Foreign Countries

According to TelexFree's own business data, which captured every transaction by every TelexFree participant for the life of the company, 1,886,631 people worldwide lost money in the

scheme.  That is, before TelexFree collapsed, these people did not get back at least the amount they invested.  Total losses in this group were $3,452,031,022.[9]

This figure is so large that it masks the daily impact on neighborhoods and lives.  To understand the true scope of the damage, the government tasked its forensic experts with, first, calculating the total number of victims and total loss and, second, analyzing the victim data and presenting it in various ways.[10]  (A report of their findings is attached as Exhibit A to this memorandum and also at Tab 24 of the Government Binder.)  The picture is grim.  Starting internationally, there were victims in almost every country, with by far the most in the United States and Brazil:



---

[9]   The government's statement of offense conduct contains lower figures – 965,225 victims who lost $1,755,000,000 – because the government's original calculation did not include losses suffered in Brazil.  A corporate shell called Ympactus (owned by Merrill, Wanzeler and Costa) entered a licensing agreement with TelexFree to sell TelexFree in Brazil.  Investors in Brazil signed up on the same web site, under the identical compensation plan.

[10]   These experts are employed by Huron Consulting, the financial consultants used by the Chapter 11 trustee. Huron, working with HSI, reconstituted TelexFree's systems for storing electronic data and were able to mine and process the data to analyze how TelexFree operated and how it impacted participants.

| Country | Number of Victims | Country | Number of Victims | Country | Number of Victims | Country | Number of Victims |
|---|---|---|---|---|---|---|---|
| Brazil | 949,720 | Cambodia | 15,079 | Belarus | 3,965 | India | 1,753 |
| United States | 169,554 | Paraguay | 14,450 | Malaysia | 3,911 | Guatemala | 1,712 |
| China | 98,133 | Mexico | 11,545 | Puerto Rico[1] | 3,739 | South Africa | 1,653 |
| Peru | 78,889 | Bolivia | 10,830 | Canada | 3,653 | Haiti | 1,574 |
| Portugal | 75,502 | Ukraine | 10,460 | Venezuela | 3,279 | Netherlands | 1,094 |
| Dominican Republic | 73,990 | Nigeria | 8,644 | Taiwan | 3,270 | Moldova | 997 |
| Colombia | 59,878 | United Kingdom | 7,356 | Afghanistan | 2,951 | Thailand | 983 |
| Ecuador | 56,413 | El Salvador | 7,285 | Tanzania | 2,911 | Costa Rica | 905 |
| Spain | 37,908 | Indonesia | 7,056 | Rwanda | 2,563 | France | 881 |
| Uruguay | 34,804 | Japan | 5,656 | Kenya | 2,341 | Romania | 716 |
| Italy | 29,019 | Honduras | 5,631 | Argentina | 2,278 | Germany | 706 |
| Russia | 26,745 | Chile | 4,650 | Hong Kong[1] | 2,232 | Switzerland | 659 |
| Uganda | 17,253 | Kazakhstan | 4,314 | Ghana | 1,885 | 197 Others | 13,256 |
| | | | | | | | 1,886,631 |

*See* Exhibit A at 16-18.

As for the United States, there were victims in every state, for a total of about 170,000 people who lost $385,507,051:



| State | Number of Victims | State | Number of Victims | State | Number of Victims | State | Number of Victims |
|---|---|---|---|---|---|---|---|
| Massachusetts | 41,050 | North Carolina | 1,541 | Wisconsin | 691 | Delaware | 318 |
| Florida | 20,605 | Pennsylvania | 1,483 | South Carolina | 612 | Louisiana | 318 |
| California | 19,415 | Utah | 1,444 | Missouri | 580 | Ohio | 308 |
| New York | 12,803 | Rhode Island | 1,265 | Iowa | 564 | Maine | 301 |
| Texas | 6,288 | Kansas | 1,234 | Montana | 542 | Washington D.C.[1] | 219 |
| Alabama | 4,658 | Wyoming | 1,026 | Michigan | 527 | Oregon | 166 |
| New Jersey | 4,159 | Nevada | 1,011 | New Hampshire | 502 | New Mexico | 136 |
| Connecticut | 3,380 | Colorado | 908 | Tennessee | 490 | Kentucky | 94 |
| Maryland | 3,353 | Virginia | 877 | Oklahoma | 485 | Vermont | 49 |
| Georgia | 2,553 | Minnesota | 833 | Hawaii[1] | 467 | South Dakota | 26 |
| Arizona | 1,727 | Washington | 750 | Arkansas | 425 | North Dakota | 20 |
| Illinois | 1,633 | Indiana | 723 | Idaho | 406 | West Virginia | 19 |
| Alaska[1] | 1,576 | Nebraska | 700 | Mississippi | 319 | 606 Others | 23,975 |
| | | | | | | | 169,554 |

*See id.* at 9-11.

Focusing on the 41,050 TelexFree victims in Massachusetts – which is more than the entire population of Fitchburg – they live in nearly every town:  almost 3000 people in Framingham alone, nearly 1500 in Worcester and over a thousand in Lawrence, Everett, Lowell, Revere and Somerville.  TelexFree victimized thousands in Boston (923) and surrounding towns, *e.g.*, East Boston (653), Chelsea (676), Jamaica Plain (408), Dorchester (536), and Allston (127).

| City / Municipality | Number of Victims | City / Municipality | Number of Victims | City / Municipality | Number of Victims | City / Municipality | Number of Victims |
|---|---|---|---|---|---|---|---|
| Framingham | 2,902 | Milford | 542 | Quincy | 222 | Stoughton | 160 |
| Lawrence | 1,995 | Dorchester | 536 | Roslindale | 213 | Saugus | 159 |
| Everett | 1,605 | Marlborough | 527 | Hyannis | 209 | Fall River | 152 |
| Worcester | 1,425 | Medford | 454 | Ashland | 206 | Salem | 145 |
| Lowell | 1,203 | Jamaica Plain | 408 | Brighton | 205 | Raynham | 140 |
| Revere | 1,140 | Methuen | 407 | Hudson | 190 | Newton | 137 |
| Somerville | 1,062 | Woburn | 373 | Rockland | 185 | Edgartown | 131 |
| Malden | 975 | Weymouth | 341 | Norwood | 185 | Allston | 127 |
| Boston | 923 | Waltham | 335 | Taunton | 177 | Watertown | 125 |
| Chelsea | 676 | Hyde Park | 325 | Mattapan | 175 | Vineyard Haven | 119 |
| Lynn | 657 | Peabody | 302 | New Bedford | 173 | Haverhill | 118 |
| East Boston | 653 | Marlboro | 301 | Leominster | 173 | Melrose | 114 |
| Brockton | 544 | Randolph | 235 | Abington | 171 | 2,870 Others | 16,093 |
| | | | | | | | 41,050 |

*See id.* at 14.  Those 41,050 Massachusetts residents lost $120,657,924, with an average loss of $2,940 per victim.  Sixteen thousand forty-four people in this state lost over $1,000, with an average loss of $2,117 per person; 2,060 people lost over $10,000, with an average loss of $14,867 per person; 418 lost over $25,000; 127 lost over $50,000; and 35 lost over $100,000 in TelexFree.  And this is just Massachusetts.  *See id.* at 15.  In October 2014, in coordination with the Chelsea Collaborative, the government hosted an outreach event for TelexFree victims in the Chelsea Middle School cafeteria.  A thousand people showed up; volunteers collected their names and personal information to help file claims for restitution.

Worldwide, the average TelexFree victim lost a seemingly modest $1,830 in U.S. currency, but this masks two important points:  first, if you live in Nicaragua – or Uganda, Cambodia, Paraguay, Kenya, Moldova, Peru, or even just in a working class neighborhood in Stoughton – that's a lot of money.  Second, while the average was $1,830, TelexFree defrauded so many people

22

that, in absolute terms, a large number of people were financially devastated by the scam.  For example, 41,416 people lost over $10,000; 4,842 lost over $50,000; and 1,054 people lost over $50,000.  Twenty-three people lost over $250,000.  *See id*. at 6.

**B.** **Victim Impact Statements and Interviews Corroborate the Damage Implied by the Business Data**

Unfortunately, the numbers are confirmed, in vivid terms, by the government's victim interviews and the flood of written victim impact statements.[11]

The stories are depressingly repetitive.  TelexFree's victims were overwhelmingly working class people looking to make a few extra dollars on the side.  Most were recruited by friends or colleagues, who signed up earlier and were now making money.  Most of the victims interviewed had seen Merrill's PowerPoint presentation, shown to them by TelexFree participants who recruited large numbers of people into their "downlines" by hosting TelexFree seminars at private locations and local hotels.  So, for example, C.J., a house cleaner in Everett, saw Merrill's PowerPoint at a seminar in Woburn.  G.M., an electrician in Lynn, saw the PowerPoint on TelexFree's site and said it convinced him he could make money.  E.M., a Boston school bus driver living in Malden, saw it at a seminar in Quincy he attended with a friend.

These people weren't stupid.  Ironically – and apparently unlike James Merrill – most victims interviewed by the government were suspicious of TelexFree because it seemed too good to be true.  But, after months of seeing their friends and relatives join and make money, they did as well.  House cleaners, Dunkin' Donuts workers, nurses, electricians, restaurant workers, they invested tax refunds (very popular), insurance settlement checks, inheritances, 401(k) funds (also

---

[11]  The government submitted a binder of victim impact statements to the U.S. Probation Office and, at the sentencing hearing, will ask that the statements be made part of the record.

popular), and other savings. Some people TelexFree left destitute. Others simply lost money they had been saving for years, suffering a financial setback from which they could not easily recover.

The government received victim statements from as far away as Europe and Africa.

A.M.S., single mother in Poland, was recruited by a friend and invested about 16,000 Euro:

> Since I have been promised very attractive profit I borrow money and invested all I had in TelexFree, I bought so called family packs up to 11 each for 1475 dollars. . . . Every day I spend about two hours to make 55 ads. I hoped that I could buy a little apartment in Poland for me and my child after one year.
>          . . . .
>
> I felt like my world is going all in black I lost my money and I had a big debt. I could not look at myself I felt guilty shame and sadness for many weeks and then months. I knew that there is nothing like easy job from home I had to work now more days and I could not see my little son.
>
> I know I would not get back my time, my nerves but I believe in justice and that I can get my investments back from the people who are responsible for this scam.

I.L.S., from Catanzaro, Italy, invested about $4,500. He reported,

> I have a difficult situation at home. I have haemophilia, are sick of hepatitis C; I have about 100,000 Euros debt with banks and financial institutions and the money that I had invested with telexfree, were used to pay the school for my children. Now I'm definitely put a lot of hur, I was really stupid to believe in TelexFree.
>
> I hope to at least get back my money, do not want anything more, just my money, to keep for my children. Not many, I know, but if my kids, and they ask avranno need something to their father, so at least I can say about it, and not always no!

Similar sentiments were expressed, *e.g.*, by K.E.U, who lives in Uganda,[12] and J.I. in Ireland.[13]

---

[12] "I am bewitching their [TelexFree's] local agent here in Entebbe so that he suffers from leprosy. I am in debts suffering with school fees for my 7 children. I would like to be considered for payment. I filled claim forms."

[13] "I invested all the money I kept for children school fees, and since the closure of TelexFree I have been depressed . . . TelexFree broke my heart and nearly sent me to early grave. Please I urge American Authority to whatever means to recover our money and ensure that we get justice[.]"

Victims across the United States also spoke of financial ruin.  B.N. wrote,

The economic consequences were catastrophic because I put all the money I had from work, the money I had to pay for my daughters' college plus the money I obtained from a loan, I put it on TelexFree.

Similarly, J.H. reported,

I used all my savings . . . and decided to borrow money to buy some more. . . . I still don't know if I will ever get this money back and every day I pray for it. [Merrill's] actions have created a very difficult strain on my family, on my kid's future and on myself, emotionally.  I'm still making ends meet and hopefully I will recover this money to pay my family and friends back.  It is horrible to look at their faces everyday knowing that I don't know how to repay this debt.

E.D.J. wrote that she and her husband invested $20,000 - $10,000 from refinancing her car with DCU and $10,000 from her husband's 401(k).  She asked, "As you can tell I am desperate need of at least knowing if I'll ever be able to recuperate our money and how long would this process take?"

For his part D.L. deemed himself a "failure," writing,

I lost $16,300 total from this stupid investment that I never have been able to get it back. . . .  Those money that I've saved from three years of working hard ruined my whole life, and now I have to live by blaming myself every day.  I deserve that, yes I do, but what about my family, my kids?  They don't deserve this failure father they have.

Some were succinct.  O.E. wrote,

I am Miss [O.E.], I invested 5600 dollars into telex free on the month of April.  That was my life savings.  Just barely two weeks the were sued to court. I am devastated. Please what to do.  I need help.

This isn't cherry-picking:  the government received hundreds of victim statements like these.

Moreover, like D.L. above, numerous victims themselves felt guilt about recruiting friends and loved ones to join TelexFree, or about being unable to pay off debts they now owe because of the collapse.  S.H., a U.S. resident, said,

> When TelexFree stopped paying, I feel very bad with myself, my family, coworkers and friends, I didn't have any idea what to tell them, them trusted in me, and for most of them I failed, I spent two years making payments of the personal loan and lost friends that I have for years.

J.P. wrote,

> I encouraged my best friend Jose [Z.] to [invest], and he fell in the scam too. Now I totally lost contact with him because he blames me for his missing money. That cannot be built again and it is not quantifiable in money. Please send the guilty ones to jail forever and refund the people.

G.A.M., another U.S. resident, said in part, "I wish you could help me with this situation because I still feel a burden on my conscience for not having paid this money and this has affected my life, my family, my credit, my peace and my tranquility. I hope you can help. Thank you in advance."

Major TelexFree participants, who had set up storefronts and recruited hundreds of people in their downlines, reported similar guilt. Fausto da Rocha, interviewed by the Boston Globe in June 2014, recruited about 20 acquaintances: "My career is gone. I'm going to clean houses with my wife. Cleaning houses is a good business." A tax preparer in Somerville told the government that, in light of the collapse, he was writing checks to the people he recruited who lost money.

Several news sources in the Dominican Republic and Brazil reported suicides in response to TelexFree's collapse. *See, e.g., With Debts Mounting After Investing in TelexFree, Police Officer Commits Suicide in State of Rio Grande do Norte*, www.ac24horas.com (12/4/13) (*Govt Binder* at Tab 23 (translated from Portuguese). Several victim impact statements alluded to his idea. I.K., country of residence unknown, invested his "life savings" in TelexFree and said in part, "If I don't get my money back I will have only one option; suicide … I cannot even call my dad to talk to him because I feel too embarrassed." C.D., a resident of the Dominican Republic, said he invested more than $16,000 in TelexFree, had little money left, and "I was thinking die by mi own many times." According to the Brazilian Federal Police, in northwestern Brazil entire towns

26

were financially wiped out by TelexFree; Brazilian news outlets have chronicled the TelexFree fallout for years.  *See id.*

## SENTENCING CALCULATION AND RESTITUTION

**I.    THE PROBATION OFFICER'S SENTENCING CALCULATION IS CORRECT**

### A.    The Amount of Loss (+30 Levels)

As noted above, there is no serious debate about the losses caused by TelexFree – it's just math.  Because the TelexFree's servers preserved every transaction by every participant, the government can determine how many participants were "net losers," that is, how many participants received from TelexFree less money than they invested, the individual losses incurred and total losses overall.

We know that 1,887,000 TelexFree participants were net losers, and each net loser is a victim of the offense.[14]  These people lost a total of $3,045,000,000.  *See* Exhibit A at 5-6 (evidence summary prepared by Huron Consulting).  This is many magnitudes above $550,000,000, the top rung in the sentencing chart for financial crimes.  *See* U.S.S.G. § 2B1.1(b)(1)(P); *PSR* ¶ 70 (same analysis under prior figures, 965,225 victims suffering $1,755,927,755 in loss).

### B.    Merrill's Role in the Offense (+4 Levels)

As to other enhancements, Merrill "was an organizer or  leader of a criminal activity that involved five or more participants or was otherwise extensive."  U.S.S.G. § 3B1.1(a).  Merrill

---

[14]  The Guidelines define victim as "any person who sustained any part of the actual loss." U.S.S.G. § 2B1.1(b)(2).  Sentencing courts accordingly count net losers in pyramid schemes as individuals sustaining actual losses.  *See, e.g., United States v. Bunchan*, 580 F.3d 66, 70 (1st Cir. 2009) (affirming sentencing enhancement for pyramid scheme with more than 250 victims).  By contrast, individuals who "receive a return or break even" from a fraudulent scheme are not "victims" under the Guidelines.  *See, e.g., United States v. Orton*, 73 F.3d 331, 334 (11th Cir. 1996).  The statutes governing restitution similarly define victims as those "directly and proximately harmed as a result of the commission of an offense."  18 U.S.C. §§ 3663(a)(2) & 3663A(a)(2).  In turn, courts order the operators of pyramid schemes to pay restitution to net losers.  *See, e.g., Bunchan*, 580 F.3d at 66–67; *see also United States v. Lazar*, 770 F. Supp. 2d 447, 452 (D. Mass. 2011) (barring restitution to coconspirators).  And in the aftermath of a fraud, victims are only entitled to recompense for their net loss, as opposed to unrealized profits.  *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 235 (2nd Cir. 2011).

owned 50% of TelexFree and ran it day to day – a company with over a million customers worldwide – from his offices in Marlborough, Massachusetts.  Merrill

- Co-founded the company with Wanzeler and Costa, and was a co-owner of the sister corporate shell in Brazil (Ympactus).

- Supervised the office staff, which ranged from about five to 15 depending on time frame.  These people included the marketing manager, key contractors for IT and VOIP based elsewhere, and the staff that handled TelexFree's Quickbooks data, bank and payment processor information, customer complaints, VOIP issues, and other matters.

- Opened and controlled TelexFree's 30 bank accounts and negotiated and signed TelexFree's agreements with third party payment processors.

- Led extravaganza events attended by thousands of participants, addressing the crowds from a stage (or, in one instance, from the deck of a cruise ship rented by TelexFree for the occasion).

- With his co-founders, was involved in all strategic decisions affecting the company, from the web site to the compensation plan to when and how to declare bankruptcy in April 2014.

These are just examples.  Yes, it appears that Wanzeler had more control over the internal guts of TelexFree's operations, but the role enhancement is not restricted to one person – the Guidelines say "an" organizer or leader, not "the" organizer or leader.  It is enough that Merrill served, to say the least, in a "top echelon role." *United States v. Tejada-Beltran*, 50 F.3d 105, 111 (1st Cir. 1995).

The criminal activity was also quite extensive; while it probably involved five or more people,[15] it certainly involved over a million victims in over a hundred countries and billions in losses, facts satisfying any sane definition of "extensive."  *See, e.g., United States v. Dietz,* 950

---

[15]  Merrill, Wanzeler, Costa, Lyvia Wanzeler (Wanzeler's daughter, now under indictment in Brazil), Leonardo Casula (a close associate of Wanzeler, now under indictment in the United States and Brazil), and certain major TelexFree participants, *e.g.*, Sann Rodrigues (recently convicted of visa fraud in the United States and now under indictment in Brazil).

F.2d 50, 53 (1st Cir. 1991) (emphasizing importance of "width, breadth, scope, complexity, and duration of the scheme"); *see also United States v. Kabouni,* 641 Fed. Appx. 6, 8 (1st Cir. April 16, 2016) (affirming that activity was "extensive" where it involved store employees and numerous SNAP beneficiaries, and the illicit transfer of over $1.9 million in SNAP credits over roughly three years); *Tejada-Beltran*, 50 F.3d at 113 (citing *Dietz*).

### C.    Substantial Hardship to More Than 25 People (+6 Levels)

There can be no serious debate that TelexFree caused substantial financial hardship to at least 25 people.  *See* U.S.S.G. § 2B1.1(b)(2)(C).  There are nearly two million victims worldwide; 47,572 of them lost at least $10,000 in U.S. currency.  *See* Exhibit A at 6 (loss stratification chart). Even without the litany of financial devastation in the victim impact statements submitted to the Court, the odds of at least 25 people <u>not</u> having suffered substantial financial hardship is about zero.  *See also, e.g., United States v. Minhas*, ___ F.3d ___, 2017 WL 942661 *2-5 (7th Cir. March 10, 2017) (in companion fraud cases with a total of 426 victims, rejecting argument that enhancement requires individualized assessment of each victim's circumstances where overall evidence showed significant financial loss to a class of victims with modest means).

### D.    Sophisticated Means (+2 Levels)

Lastly, the Probation Department applied a two level enhancement for use of sophisticated means.  *See* U.S.S.G. § 2B1.1(b)(10); *PSR* ¶ 72.  As noted by the Probation Officer, TelexFree maintained a sophisticated web site that hosted a separate page for every user (millions of pages). Each user accumulated credits (which could be exchanged for dollars) for a range of bonuses and commissions, including not only the ad-posting mechanism described above but a complex binary recruitment system featuring compounding bonuses depending on how each user arranged his recruits in his downline.  The company used payment processors to process, literally, billions of

dollars in transactions over a roughly two-year period.  TelexFree had accounts in at least the United States, Brazil, the Dominican Republic and Singapore.  Moreover, the company did in fact have a usable VOIP telephone service, although 97% of VOIP plans were never used.   The TelexFree scheme checks nearly every box in the application note for this enhancement.[16]  *See also, e.g., United States v. Pacheco-Martinez*, 791 F.3d 171, 179 (1st Cir. 2015) (affirming use of enhancement where defendant used multiple corporate shells and varying corporate documents).

Finally, a substantial portion of TelexFree's business, and a substantial portion of the fraud, occurred outside the United States.  Programmers in Brazil maintained TelexFree's web site, and two of its founders (Wanzeler and Costa) worked from there.  Moreover, as TelexFree grew exponentially over time, thousands of major participants in a hundred countries locally recruited hundreds or thousands of additional victims.  *See* U.S.S.G. § 2B1.1(b)(10)(B) ("a substantial part of a fraudulent scheme was committed from outside the United States").

The Probation Officer's overall calculation is correct:  Merrill has an adjusted offense level of 43, corresponding to a Guideline range of life.

## II.   MERRILL DESERVES TEN YEARS IN PRISON, BUT HE DOES NOT DESERVE MORE, SO THE COURT SHOULD ACCEPT THE PENDING RULE 11(c)(1)(C) PLEA AGREEMENT

As is obvious from the above calculation, the sentencing range of zero to ten years presented in the pending Rule 11(c)(1)(C) plea agreement is somewhat below "life."   The government did not agree to the ten year limit so it could begin the sentencing process "bidding

---

[16] "For purposes of subsection (b)(10)(C), 'sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense.  For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means.  Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means."  U.S.S.G. § 2B1.1 App. Note 9.

high." It agreed because Merrill deserves ten years in prison, but not more than that. The Court should accept the plea agreement and sentence Merrill to ten years.

*First*, as an express condition of this plea, Merrill was required to engage in a proffer with U.S. and Brazilian investigative authorities to fill in the gaps in the government's understanding of TelexFree and to assist both governments' active investigations. *See Plea Agreement* at 4. Without this condition the government would not have entered the agreement.

*Second*, Merrill knew by mid-2012 that TelexFree was a pyramid scheme – this is obvious from Merrill's PowerPoint presentation, his emails, and doubts expressed by others as early as December 2012. But by the Summer of 2013 the drumbeat of warnings had become so deafening that Merrill, however belatedly, began steps to make TelexFree's compensation system "more compliant." He hired a new lawyer to advise TelexFree and, on that lawyer's advice, a consulting group in Arizona. In this Merrill is distinct from his co-defendant Wanzeler, who appears to have resisted Merrill's initiative and the anticipated changes.[17] In March 2014, Merrill told TelexFree's lawyer that certain changes would have happened sooner, but Merrill was "outvoted." While this excuse for running a two-year criminal enterprise does not exonerate Merrill for the financial devastation he helped to cause, it supports the view that Merrill was not the fraud's prime mover, and eventually tried to fix the problem.

---

[17] Of course, Merrill did not want to make the changes too quickly. The new lawyer told the government that in August 2013 he warned Merrill that TelexFree was an illegal pyramid scheme, but that TelexFree was slow to make changes because they were afraid of losing participants. Email from that time corroborates the lawyer. *See Govt Binder* at Tab 25 (9/30/13 email: "You will not survive legally (civil or criminal) or from a business standpoint, unless there is a dramatic change …"; 11/17/13 email: "And, understanding a degree of business/legal risk is being chosen by the company to avoid losing your sales force who must step by step adapt to a system that requires a predominance of revenue from product/service sales over revenue from sales support systems. . . . From our conversations, you know that whatever you can do to mandate and promote retail sales and move toward make them the predominant revenue component, the better for you from a legal standpoint, and 'we will take as much as you can live with' in this regard." It in fact took seven months to make any changes at all, after which TelexFree collapsed. During that period, hundreds of thousands of new participants signed up with TelexFree.

*Third*, on that note, overall Wanzeler was the worse actor; if he were before the Court, the government would probably seek a 20-year sentence. *See also PSR* ¶ 63. Unlike Merrill, it appears that Wanzeler and Costa were more aware of TelexFree's dubious legality at the beginning and less concerned along the way. According to percipient witnesses, Wanzler was more reluctant than Merrill to give TelexFree's financial information to the MSD during its investigation and, over time, it appears that Wanzeler embezzled and laundered millions of dollars from TelexFree's coffers. It is not a coincidence that Wanzeler fled the United States <u>the very day</u> the government first showed its hand by searching TelexFree's offices in April 2014.

*Fourth*, on a more general level, while general deterrence is vital in these kinds of cases – a different, nascent pyramid scheme even fled the United States for the Carribean after the arrests in TelexFree – there appears to be no need for specific deterrence of this actor. That is, there is nothing to indicate that Merrill will ever try to do something like this again.

Weighing Merrill's participation in the fraud against the above, a sentence of 10 years is in the public interest.

## III. THE GOVERNMENT ANTICIPATES DISTRIBUTING SEIZED TELEXFREE ASSETS TO VICTIMS THROUGH THE VERIFIED CLAIMS PROCEDURE ADMINISTERED BY THE CHAPTER 11 BANKRUPTCY TRUSTEE

The massive losses from TelexFree, coupled with the fact that the government has the means to identify most of the 1.8 million net losers and their loss amounts, creates a complex restitution picture. Because of that, the government proposes an approach to restitution that (a) makes use of the already-running claims process in the bankruptcy proceedings and (b) limits restitution to the amounts disbursed during that process. As discussed below, the Court has the discretion to take both steps.

When the government raided TelexFree's offices in April 2014, in conjunction with the SEC it froze and later seized about $140,000,000 in TelexFree's domestic bank accounts and payment processor reserve accounts.  The government also seized real property and vehicles worth about $8,000,000.  Finally, on January 4, 2017, the government seized approximately $19,000,000 in cash that appears also to be fraud proceeds from the TelexFree scheme.

Pending entry of a final order of forfeiture and approval from the Department of Justice pursuant to 21 U.S.C. § 853(i), the government anticipates using all of these assets to compensate victims of the fraud.  The government would distribute the forfeited assets by first transferring the funds to the Chapter 11 trustee ("Trustee"), under an agreement that the Trustee only use it to compensate victims.  The Trustee, using a third party vendor, has set up an online claims process that allows TelexFree victims anywhere in the world to enter their personal and TelexFree account information, after which the system matches that data to TelexFree's business data to verify the claim.  The Trustee will do additional anti-fraud screening as well.  The claims portal went online on May 26, 2016, with a deadline for claims of March 15, 2017.[18]  There will be a process for accepting late-filed claims.  After verifying all claims, the Trustee would distribute the funds.

Beyond the Trustee's claims process, however, restitution may be impractical.  *See* 18 U.S.C. § 3663A(c)(3) (granting discretion to sentencing court where restitution impractical).  After disbursement of the assets seized by the government, literally hundreds of thousands – perhaps more than a million – victims will still be uncompensated.  In theory, after whatever sentence

---

[18]  The Trustee's claim system has been publicized, and over 1,000,000 victims have already submitted claims. *See, e.g.*, Beth Healy, *Claim Site is Live for TelexFree Victims*, Boston Globe (June 2, 2016).  The order approving the claims process was served by email to all participants for whom the Trustee had an available email addresses (each participant had provided an email address to TelexFree when they signed up) and was posted on the Trustee's website.  The Trustee also requested that certain multi-level marketing websites (b*ehindmlm.com, theponzibook.blogspot.com,* and *Ponzitracker.com*) post notice of the TelexFree claims process on their sites.  The Trustee also held informational meetings in impacted neighborhoods to show people how to use the claims process.

Merrill serves, the Clerk's Office could collect a monthly amount from him for further distributions but, relatively speaking, the amounts would be miniscule and it would be impossible to make distributions on a pro rata basis.  As to Merrill's assets, they have already been seized and counted in the total amount currently available for compensation.

A.      **The Court Has Discretion to Fashion a Practical Approach to Restitution**

The Mandatory Victims Restitution Act ("MVRA") requires defendants convicted of fraud and other crimes against property to pay restitution to those "directly and proximately harmed" by the offense. 18 U.S.C. § 3663A(c)(1)(A)(ii). The amount of restitution must equal "the full amount of each victim's losses . . . without consideration of the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A).  There are two exceptions:  the MVRA does not apply if the sentencing court finds that "(A) the number of identifiable victims is so large as to make restitution impracticable; or (B) determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." § 3663A(c)(3); *see also, e.g., United States v. Hensley*, 91 F.3d 274, 276 (1st Cir. 1996) ("Federal courts possess no inherent authority to order restitution, and may do so only as explicitly empowered by statute.").

These exceptions also mean the Court has discretion to use various means to fashion restitution in a given case.  *See, e.g.*, *In re W.R. Huff Asset Mgmt. Co., LLC*, 409 F.3d 555, 563–64 (2nd Cir. 2005) (holding district court did not abuse discretion by accepting settlement agreement as "reasonable substitute restitution" when MVRA exceptions applied).  The exceptions are meant to help victims – § 3663A(c)(3)(A) (the complexity exception) ensures that sentencing is not delayed by difficult restitution calculations best left for civil proceedings. *See United States*

*v. Reifler*, 446 F.3d 65, 136 (2d Cir. 2006) ("Congress plainly intended that sentencing courts not become embroiled in intricate issues of proof.").  Similarly, § 3663A(c)(3)(B) – the numerosity exception – prevents defendants from receiving only a trifling amount of restitution.  *See United States v. Nathanson*, 948 F. Supp. 2d 1055, 1064 (C.D. Cal. 2013) (noting that the sentencing judge found it "almost insulting" for victims to receive a miniscule restitution payment). Put another way, the MVRA obligates courts to order restitution in full, unless, from the victim's perspective, there are reasons why "it would be better not to have anything." *Id*.  This latter point pertains here: after the bankruptcy claims process, in light of the enormous number of victims and overall loss, additional monthly restitution from Merrill would amount to far less than a penny per victim, or just pennies per victim even if a subset of victims could be prioritized for restitution in a principled and fair manner.

Sentencing courts have invoked the numerosity exception in frauds with thousands of victims. *See, e.g.*, *United States v. McVay*, 447 F.3d 1348, 1349–50 (11th Cir. 2006) (invoking exception for executive convicted of securities fraud).  As another example, the court sentencing Bernard Madoff in his Ponzi scheme prosecution ruled under § 3663A(c)(3) that restitution was impracticable by the usual means.  *See United States v. Madoff*, 09 Cr. 213 (DC) (S.D.N.Y. Sept. 24, 2009) (ECF No. 106).  At the time of Madoff's sentencing, the trustee overseeing the liquidation of Madoff's assets had received a mere 15,870 claims.  *See Govt's Mem. in Support of Mtn. Pursuant to Title 18, United States Code, Section 3663A(c)(3)*, *United States v. Madoff*, 09 Cr. 213 (DC), at 7 (S.D.N.Y. Sept. 22, 2009) (ECF No. 105).

**B.  The Government Will Seek Permission to Transfer Forfeited Assets to the Bankruptcy Trustee for Distribution to TelexFree Victims Through the Bankruptcy Claims Process**

"The Attorney General has the responsibility for disposing of funds seized under the criminal forfeiture statute." *United States v. Mei Juan Zhang*, 789 F.3d 214, 217 (1st Cir. 2015). The Attorney General can "grant petitions for mitigation or remission of forfeiture, restore forfeited property to victims of a violation of this subchapter, or take any other action to protect the rights of innocent persons which is in the interest of justice and which is not inconsistent with the provisions of this section." 21 U.S.C. § 853(i)(1).

The "interest-of-justice" clause 21 U.S.C. § 853 "grants the Attorney General extraordinarily broad discretion over the handling of forfeited funds." *United States v. Gordon*, No. 03 CR. 1494 (GEL), 2005 WL 2759845, at *3 (S.D.N.Y. Oct. 19, 2005), *aff'd sub nom. DSI Assocs. LLC v. United States*, 496 F.3d 175 (2nd Cir. 2007). The clause also allows the Attorney General to transfer forfeited funds to an outside entity tasked with repaying victims – essentially what the government intends to do here. The court overseeing the fallout of the Madoff Ponzi scheme used a similar solution. *See S.E.C. v. Madoff*, No. 08 CIV. 10791LLS, 2009 WL 980288, at *2 n.1 (S.D.N.Y. Apr. 10, 2009). There, the government, along with the S.E.C. and a trustee appointed under the Securities Investor Protection Act, wanted to stop fraud victims from filing a bankruptcy petition against Madoff, arguing that it would needlessly divert funds from the remission process. *Id.* at *1. The judge not only allowed the victims to proceed, but suggested that the *bankruptcy* trustee oversee the distribution of funds to victims: "The Attorney General, under his statutory authority to 'take any other action to protect the rights of innocent persons which is in the interest of justice' might consider saving administrative costs by delegating forfeited property to the bankruptcy estate." *Id*. (citing 21 U.S.C. § 853(i)).

In another example, in the securities fraud enforcement action against executives at Adelphia Communications Corporation, the government entered into an agreement with both defendants and third parties to facilitate compensation to victims. *W.R. Huff*, 409 F.3d at 558. The Second Circuit upheld the district court's order exempting the defendants from restitution under the MVRA's exceptions and approving the settlement. *Id*. at 563–64.

### C.     The Government Will Submit a Proposed Order to the Court on Restitution

The government will submit a proposed restitution order to the Court addressing the government's anticipated transfer of funds to the Trustee and providing that, beyond funds disbursed during the bankruptcy claims process, restitution is impracticable pursuant to 18 U.S.C. § 3663A(c)(3)(A).[19]

There are far more victims in this case (1.8 million) than in others where sentencing courts have ruled that restitution is impracticable under the numerosity exception. *See, e.g., W.R. Huff*, 409 F.3d at 563; ("tens of thousands of victims"); *Nathanson*, 948 F. Supp. 2d at 1057 (2,400 victims). Beyond the assistance of the Trustee's process, the number of victims in this case would overwhelm the court's ability to oversee the administration of additional restitution.

*First*, in the normal course a restitution order must identify every victim entitled to restitution. *See United States v. Catoggio*, 326 F.3d 323, 328 (2nd Cir. 2003) ("Identification of victims is a statutory prerequisite to the application of the MVRA."). Here, listing the names of

---

[19] As it did on January 4, 2017, of this year, it is always possible that the government recovers additional TelexFree funds. If the government does recover substantial additional funds after the bankruptcy claims process is complete, the government will petition the Court to revisit its restitution order and seek to distribute the additional funds to victims who (a) filed a claim in the bankruptcy claims process but (b) received no compensation or incomplete compensation because the amount of funds was not enough to cover all verified claims.

all victims would be impossible – the number exceeds the parameters of a Excel spreadsheet and would require a stand-alone database.

*Second*, if restitution was ordered for all victims – including those not reimbursed in the claims process – the court would be repaying victims, for 20 years, miniscule amounts derived from monthly payments by Merrill.  In certain circumstances, the court is free to order that some victims get paid before others, see 18 U.S.C. § 3664(i); but pro rata distribution is appropriate in the absence of differentiating criteria.  *See, e .g., United States v. Mueffelman*, 400 F. Supp. 2d 368, 386 (D. Mass. 2005), *aff'd*, 470 F.3d 33 (1st Cir. 2006) (ordering restitution paid on pro rata basis when no way to distinguish among victims).  A few hundred dollars a month cannot be distributed pro rata to a million victims in dozens of countries.

*Third*, forcing the Clerk's Office to develop a process to disperse funds to 1.8 million victims worldwide would not be realistic, especially where a third party vendor is essentially already doing it.  In sum, transfer of available assets is by far the fastest way to get compensation (a) to actual victims of the fraud, (b) in the correct amounts, (c) as fast as practicable.

## CONCLUSION

The Court should sentence James Merrill to ten years in prison and three years of supervised release.  The government also respectfully requests that the Court impose restitution as outlined above and pursuant to a proposed order to be submitted to the Court.

Respectfully submitted,

William Weinreb
Acting United States Attorney


By:      /s/ *Andrew Lelling*
Andrew E. Lelling
Neil J. Gallagher, Jr.
Assistant U.S. Attorneys                                    Date:   March 16, 2017

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent to those indicated as non-registered participants, on March 15, 2017.


          /s/ *Andrew Lelling*
          Andrew E. Lelling