UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 14-CR-40028-TSH |
| | ) | |
| | ) | |
| JAMES MERRILL, | ) | |
| | ) | |
| Defendant. | ) | |

_____)

**JAMES MERRILL'S SENTENCING MEMORANDUM**

It is a tragedy that a person like Jim Merrill finds himself facing a prison sentence.  Every

person to encounter him for any meaningful moment of time quickly discovers that he is truly an

extraordinary human being. The kind of father who puts family above all else and makes sure he

is a full participant in his children's lives, a husband who is actually a caring and attentive

partner to his wife, an uncle who has a significant impact on the lives of his nieces and nephews,

the neighbor you watch jog with his rescue dog every day and trust with the key to your home,

the coach that every parent wants to coach their child because he treats all his players equally

and knows that imparting invaluable life lessons is more important than winning a youth sports

game, the friend who lends a genuine ear, who earnestly cares about you and your family, who

travels across the country to visit, console and ultimately make a video of a dying, ALS-stricken

friend as a gift to his then-young children, who is there to help sift through debris after a fire

destroys your home, or makes sure another friend has meals and emotional support while battling

a terminal cancer diagnosis, and yet so humble and genuine that he is universally loved by those

who know him.  The stories of Jim's selflessness, humility, generosity, compassion, and his

1

genuine care for family and friends, littered throughout the 50-plus letters of support submitted to the Court, are nothing short of overwhelming.

Yet, here he stands, to be sentenced in a Federal Court. But how? The emails submitted to the Court in Mr. Merrill's second sentencing submission (and which are detailed *infra*) begin to tell the story. In beginning TelexFree, as the government readily acknowledges, Jim had no criminal intent—far from it. *Cf.* Rule 11 Transcript, dated October 24, 2016 ("Rule 11 Transcript," herein), at 25 ("[w]hen TelexFree was set up, Mr. Merrill did not intend that TelexFree be a pyramid scheme …"). Consistent with his character, amply illustrated in the letters submitted to the Court, Jim began TelexFree with the intention of helping people. And, all the way through the end, Jim was the constant voice pushing for change, pushing the real decision-makers (Carlos Wanzeler and Carlos Costa) to implement the necessary changes. He contemplated resigning, as Jay Borromei told the government during an investigatory interview, *see* Govt. Discovery Letter dated December 10, 2014 (submitted in Mr. Merrill's First Sentencing Submission) at ¶A7, but was told by TelexFree's then-counsel (a nationally renowned MLM specialist) that his resignation would not relieve him of any past liability and the better course was to stay on so he could try to "right the ship" going forward. That Mr. Merrill was the constant voice for change, that he was consistently frustrated by Wanzeler's and Costa's refusal to change the compensation plan that lies at the heart of this prosecution, is evident from even a cursory review of the email database—emails written in real time, providing a unique insight into Mr. Merrill's state of mind, and which compellingly demonstrating that ***Jim Merrill did not harbor any willful criminal intent***.

That is why Mr. Merrill has plead to a relatively unique theory of criminal liability—extreme recklessness. As the government explained at the Rule 11 hearing:

> As to wire fraud itself, it would be knowingly and willfully engaging
> in a scheme or artifice to defraud or obtain property from others under
> false pretenses. In this context, knowingly and willfully can also be
> conduct by willful ignorance, conscious avoidance, or extreme recklessness.

Rule 11 Transcript at 19.  And, as counsel for Mr. Merrill clarified after the government's

allocution, Mr. Merrill was pleading to the recklessness theory:

> At the outset when Mr. -- when you asked Mr. Lelling regarding
> the elements of the offense, he told the court that the knowing
> and willful element can be met by one of three, amongst other
> avenues. He mentioned will -- willful blindness, conscious avoidance,
> or extreme recklessness. ***It's the recklessness theory that Mr. Merrill intends to
> enter a plea to the court***.

Rule 11 Transcript at 31 (emphasis added).  And, that is why this case is different from many, if

not all, prior cases this Court or any Court has confronted.  Jim Merrill so badly wanted to

change the company's compensation plan—email after email after email bears out that truism.

But, Jim Merrill did not have the wherewithal to force the changes.  He had neither the power of

personality to bulldoze Wanzeler or Costa, nor the corporate authority to alone implement the

necessary changes.  Instead, he spent month after month after month imploring Wanzeler and

Costa to make the necessary changes, and email after email after email coming up with new

ideas and suggestions that he hoped would (a) cure any problem with the company's

compensation plan and (b) meet Wanzeler's and Costa's approval.

Now, with Wanzeler burrowed in Brazil, Jim stands before the Court, to be sentenced

against the backdrop of an advisory guideline range that is so untethered from reality the

government has agreed to a range of zero to ten years.  Mr. Merrill acknowledges and sincerely

appreciates that he has admitted guilt to, and stands convicted of, serious criminal offenses.  *See*

Letter of James Merrill (Exhibit 1).[1]  Through the submission of this pleading (and the

---

[1] Both Jim's letter and Kristin's letter (Exhibit 2) will be submitted to the Court under seal.

arguments set forth herein), he does not, in any respect, seek to depreciate or minimize the gravity of harm inflicted upon the victims in this case; instead, Mr. Merrill merely seeks to illuminate the true role he played in TelexFree, to place his conduct in the proper context, and to provide the Court with a full, three-dimensional understanding of the human being that stands before the Court.

With a full consideration of these elements, the defense respectfully submits that a sentence of one year and one day is entirely proper and justifiable in this *unique* case.  A longer period of incarceration is not necessary for specific deterrence or general deterrence: one reading of Jim and Kristin Merrills' letters to the Court amply demonstrates that no rational human being would knowingly or intentionally walk the path they have endured over the past three years. Indeed, as the letters demonstrate, no period of jail is necessary to inflict punishment on a person like James Merrill—Jim and his family have endured enough punishment for a lifetime. Practically penny-less, facing financial ruin, demonized by the press, humiliated in his community, and with three children suffering emotionally and physically under the immense pressure of the federal prosecution of their dad, the defense respectfully submits that a prison sentence is not necessary to "punish" Jim Merrill, particularly with a proper understanding of his true conduct and role in this case.

The defense understands, however, that there are other factors at play—victims who lost money, an advisory guideline range that is literally "off the chart," and the government pushing a ten year prison sentence.[2]  In the end, to whatever extent the Court believes a sentence of

---

[2] For reasons detailed *infra*, the guidelines offer no meaningful assistance in this case.  *See, e.g.*, *United States v. Adelson*, 441 F.Supp.2d 506, 515 (S.D.N.Y. 2006), *aff'd* 301 Fed.Appx. 93 (2d Cir. 2008) (offense level 55, guideline range of life imprisonment, court imposes sentence of 3.5 years; noting, *inter alia*, where "the calculations under the guidelines have so run amok that they are patently absurd on their face, a Court is forced to place greater reliance on the more general

imprisonment is necessary or warranted, the defense respectfully urges the Court to impose the most compassionate sentence possible, and respectfully submits that a sentence of no more than one year and one day in jail would be entirely consistent with the objectives of § 3553(a), and the parsimony principle expressed therein that the Court should impose a sentence sufficient, but not more than necessary, to comply with the purposes of § 3553(a).

I.      _To understand how Jim Merrill became ensnared in this mess, one must understand Jim Merrill, the human being._[3]

One cannot help but be overwhelmed by the content of the letters of support submitted on Jim's behalf, but the outreach began long before sentencing in this case. After Jim's arrest, his extended family and friends stepped forward, without hesitation or reluctance, in every meaningful aspect. The government argued vociferously that Mr. Merrill could not be trusted to comply with any conditions of release, that he presented an uncontrollable risk of flight. As the Court will recall, Jim's family and friends readily offered to post their personal residences to secure Jim's pretrial release. _See, e.g._ Order of Conditions, Dkt. Entry 47.[4] His family and friends then contributed significant funds to assist with Jim's legal defense. Counsel for Mr. Merrill believes the breadth and depth of support showered on Jim and his family is unprecedented in his professional practice.

---

considerations set forth in section 3553(a), as carefully applied to the particular circumstances of the case and of the human being who will bear the consequences").

[3] The Court is no longer straight-jacketed regarding the types of information it should consider in imposing a reasonable sentence. 18 U.S.C. § 3661 clearly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." This statute, like the parsimony principle contained in 18 U.S.C. § 3553(a), now assumes greater significance in the post-_Booker_ sentencing regime.

[4] Of course, now several years later, Mr. Merrill has faithfully complied with his conditions of release.

The reasons underlying that support are laid bare in the letters submitted to the Court.[5] They cover all corners of Jim's life—family (brother, sisters, nieces, nephews, cousins), friends (from all walks of life), members of his prayer group, his current employer, parents of children he coached in youth sports—you name it, and any person that has had meaningful contact with Jim Merrill is astounded by his character, his genuine interest and concern for others, his selflessness, his faith, his optimism, his love of family, his humility . . . and on and on and on.  The defense will not burden the Court with a lengthy section that merely repeats what's written in the letters, but a few excerpts do well to capture the essence of Jim Merrill.

- "I would like to speak to the kind, gentle and generous character of my friend Jamie Merrill.  Jamie and my husband, Steve McManus, were best friends from the age of 18.  He was the first person 'I had to meet' upon visiting Massachusetts from Texas in 1989, and Best Man in our wedding two years later.  Fast forward 17 years - through children, career changes, family vacations together, and weekly phone calls to bridge the distance - and my husband was diagnosed with ALS, commonly known as Lou Gehrig's disease.  To say Jamie was devastated would be an understatement.  Because he is the man he is, Jamie began making regular trips down to Texas to spend as much time with Steve as he could, and make himself available to me and our sons as needed.  I know this was not easy in any way.  Flights to Texas are long and expensive, and Jamie was busy raising three children with Kris, coaching sports, and running his cleaning business full time.  As ALS is a cruel, degenerative disease, each journey was more difficult for Jamie, but more meaningful to Steve and me.  Jamie ruminated on ways he could positively impact the situation, and came up with the brilliant and thoughtful idea to interview Steve, asking all of the questions his sons might want to ask him when they were grown.  Through laughter and tears they recorded these sessions, replete with stories of childhood shenanigans and fatherly advice about the men Steve hoped his 10 and 11-year-old sons would become.  These recordings are the most meaningful keepsakes I have to pass on to Stephen and James, and we have them because Jamie Merrill has a heart of gold.  Following my husband's funeral, our closest friends gathered to share Steve McManus stories.  While grief was relieved with hilarity, Jamie took it upon himself to film, capturing the essence of who Steve was to each person in the room.  Again, Jamie's thoughtfulness will impact our lives forever … Jamie Merrill is a good man – an exemplary husband, father and friend.  Greed nor malice hold a place in his person; he's a giver in a world full of takers.  It is difficult for me to believe Jamie would ever knowingly

---

[5] In his first sentencing submission, Mr. Merrill submitted 26 letters to the Court. Attached hereto are an additional 26 letters, identified as Exhibits 1- 26.

hurt or steal from another person.  More likely, and most discouraging to imagine, is Jamie trusted others to operate with the same moral compass.  (Letter of Elizabeth McManus Deal, attached hereto as Exhibit 8).

- "No person every had a truer friend than Jim Merrill . . .  The support and love that Jim demonstrated to my brother Steve and his family, traveling to Dallas on several occasions, to help out however he could was truly remarkable … I have an audio that Jim Merrill made with my brother Steve near the end, interviewing him about all sorts of things, when Steve was having trouble talking and breathing, for posterity, for my two nephews. Among many things he did for Steve, making that video was one of the most compassionate and decent things I have ever witnessed." Letter of Richard McManus (Dkt. Entry 329-25).

- "In 2009, at age 45, I was shockingly diagnosed with colon cancer, which had spread to my lung . . . Jim and Kristin Merrill were the first people to contact me. Without my knowing, they quickly organized a group of volunteers to bring my family meals. Jim set up a volunteer calendar and I never had to do anything. In fact, I didn't even know it was Jim that set up the calendar. The Merrills just ensured we had meals … But the Merrills did much more than that. They helped with my children, visited me to keep up my spirits, walked with me, picked me up when I locked my keys in the car …and I could go on …Now that my cancer has returned and is terminal, they continue to provide love, prayers and support …even though they are struggling with their own trauma. That's the kind of generous people they are and I've witnessed this throughout the years." Letter of Monica Juitt (Dkt. Entry 329-22).

- "I was the second oldest of almost 20 cousins. I got a lot of attention from [Uncle Jamie] … I can say honestly it is from him where I learned to be on the lookout for selfless opportunities … I recall a defining moment in my early life. I was outside playing with Jim's children … As kids do during a game, they got into a bit of a fight. Uncle Jamie saw it and rushed over. I've never shared this before but I will never forget what I heard him say. He turned to [ ] the oldest, 'This is your sister. This is family. Your job is to protect her, not fight with her.' He said it softly, and with the intent of him understanding. Not to scold him …. He was given a gift instead. He was given an awareness of his actions. I stole that gift … I do not know the law, I do not know what it is like to do your difficult job. But I know Jim Merrill. I know him intimately. I know he is honorable and respectful. I know he is family oriented and selfless. I know he is a caring and giving person. I know this because I am. I am because I have a great relationship with my family. I am because I have great loving relationships with my friends. I am because I can have creative differences at work and resolve them with respect. I am because I can make mistakes and admit them. I am because my Uncle Jamie taught me these things." (Patrick Simone, Dkt. Entry 329-24).

- "He never boasted of his successes, always drove modest vehicles, and lived a very middle class life. Jim always attended his son's sporting events and socialized with

7

me and a close group of involved friends. Jim's personality and demeanor is that of a very generous, religious and a very caring family man who would do anything for his family and friends." (Letter of Charles Carroll, Dkt. Entry 329-8).

- "Jim is the consummate family man…." (Letter of Frederick Kramer, Dkt. Entry 329-12).

- "I have always, and I mean always, been nothing but impressed with the way Jim has conducted himself in my presence."  (Letter of George Claflin, Dkt. Entry 329-13).

- "We know Jim as a true family man who has been committed to loving and caring for his wife Kris and his three children … the Merrill's are the only neighbors we have always trusted with the key to our home. Wholesome, devoted Christian family man, the guy who regularly jogs with his rescue dog, Hunter, truly sums up the character of the man who, we understand, will stand before you in" March. (Letter of James and Pamela Cahill, Dkt. Entry 329-14).

- "Almost every year Jamie and Kris would pile all the children in the car and drive to Wisconsin to see Kris' family. I couldn't imagine being stuck in a car for eighteen hours with young children, but Jamie loved it. It gave him time to be close with his family, and he got to see how happy Kris was when she got to see her parents and brother. Jamie feels joy when others feel happiness, especially his family. I would feel blessed to be half of the father and husband Jamie is and has been to his family." (Letter of Jay Merrill, Dkt. Entry 329-15).

- "I find it hard to further summarize or explain the value and affect Jim's friendship and kindness had on me over the course of almost 10 years, but there are very few people I would write such a letter for." (Letter of Jeffrey H. Hill, Dkt. Entry 329-16).

- "I have known Jim for almost a year. We met at a weekly breakfast that we have at our church every Friday morning. It is known as the men's prayer breakfast . . . Every time Jim asked for prayers, he was not focused on himself. He was always focused on his family and his friends and how they were going to be able to go through this difficult time in their lives. Jim is a good, selfless and caring man." (Letter of Leonard Fournier, Dkt. Entry 329-20).

- "Two years ago, when I was diagnosed with advanced colon cancer Jim and Kristen, amid their own legal issues, reached out and provided support to my family and I during a very difficult time. Whether it was dropping off a dinner during my biweekly chemo treatments or getting together for a walk in the state forest to catch up and see how I was doing they were always there.  As a cancer patient, you quickly realize that family and friends who you thought would be there can be nowhere to be found while others who quite frankly played a much smaller role in your life are there to support you which quite frankly can be very humbling. My

cancer battle has reaffirmed my core belief that people are truly defined in difficult times. The compassion and support provided from the Merrills throughout this battle, in the wake of everything which was going on in their lives, is a true testament of the quality person that Jim and his family are." Letter of Christopher Curtis (Dkt. Entry 329-9).

All of the letters submitted to the Court, taken together and considered as a whole, paint a portrait of an extraordinary human being.

II.     *General background and context.*

In 2014, the government executed warrants at TelexFree. Wanzeler fled to Brazil, leaving his wife and son here, in Massachusetts. True to his character, Jim has stood tall, in the face of what can only be described as an unearthly amount of pressure and turmoil. His kids are struggling mightily. ██████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████. Kristin Merrill has described the family's suffering in her letter to the Court. *See* Exhibit 2.[6]

Jim's cleaning business is gone—lost when he was jailed at the outset of this case. The IRS has been relentless in its pursuit to collect taxes on money that was seized by the government (*i.e.*, taxes on phantom income), and it has recently taken the last retirement pennies the Merrills have ever earned—money earned through a lifetime of legitimate, lawful work. Jim spent years cleaning office buildings. Kristin has spent years working as a religious-school teacher and other worthy pursuits. Nonetheless, the IRS has taken all of their savings and continues to sweep their accounts whenever they manage to save even a meager amount of

---

[6] As noted, to be filed under seal.

money.[7]  The Boston Globe and the Worcester Telegram (amongst other news outlets) have

excoriated Jim in the most public-of-fashions, with repeated articles that severely distort Jim's

actual role within TelexFree, including just yesterday the full publication of the government's

complete sentencing memorandum (in the online version of the Boston Globe).

Nonetheless, Jim wakes up every morning determined to make each day a better one.  His

approach to life, detailed throughout 50-plus letters of support, is nothing short of remarkable.

Jim is a man of great faith and humility.  Because of his core values and beliefs, Jim always, and

only, sees the best in people.  It is important to understand Jim Merrill the person—his values,

beliefs and approach to life—to properly judge his conduct in this case.  He saw the best in

Carlos Wanzeler and Carlos Costa.  Before TelexFree, Jim hired Wanzeler to work at his

cleaning business.  He saw Wanzeler working hard cleaning offices and buildings, he believed

him to be a good, decent human being.  Throughout the course of TelexFree, Wanzeler would

reassure Merrill, playing into his religious beliefs and optimistic nature, writing things such as:

> Just remember GOD IS WITH US, I am 100% confidence , we will be the best
> company in the world, we will write a book on the FUTURE. We have a good
> Lawner [lawyer] work with us, we just need to bolive [believe] on project and
> keep focus to delivery the new product and services.

Skype Transcript, dated February 21, 2014.

Hindsight affords a certain clarity, however.  Reviewing the emails with a discerning eye

reveals how Wanzeler and Costa would demur, delay, and obfuscate when Jim pushed for

change.  Jim did not know, or realize, that Wanzeler was, all the while, amassing a fortune of

cash—that he was literally stuffing mattresses with cash.  *See, e.g.*, "*Search Tied To TelexFree*

*Case Turns Up $20m Hidden In Bed,*" Travis Anderson, Boston Globe Staff, dated January 6,

---

[7] These facts are detailed in the PSR, as well as Jim's and Kristen's letters to the Court.  *See*
Exhibit 1 and 2.

2017, available at https://www.bostonglobe.com/metro/2017/01/06/million-seized-marlborough-man-arrested-connection-with-telexfree-fraud-case/sSXgbeiJx0rjrgM7o2XhNO/story.html (last viewed March 14, 2017).  That story alone vividly illustrates the stark difference between Jim Merrill and Carlos Wanzeler (though a review of the seized assets in this case, detailed in the Superseding Indictment, also does well to illustrate the vast differences between the two men).  How these two men could co-exist within the same eco-system, in hindsight, is incredible.

III.    *TelexFree—a simple, pure and legitimate vision.*

> "**When TelexFree was set up, Mr. Merrill did <u>not</u> intend that TelexFree be a pyramid scheme**."

Government Prosecutor, October 24, 2016, Rule 11 Hearing, at 25.

From the outset, Jim intended TelexFree to be a legitimate, viable entity, that would serve the needs of immigrants looking for an affordable way to telephone relatives in their native country.  The origin of TelexFree was simple.  Jim Merrill hired Wanzeler to help with his commercial cleaning business.  While at work, Wanzeler would complain that his wife was spending hundreds of dollars in phone bills each month to call relatives at home.  Jim hopped onto the Internet to find a solution to his friend's problem.  He discovered a less expensive way for Wanzeler's family to telephone relatives overseas.  In his entrepreneurial spirit, Jim believed he could develop a business around the idea, all the while helping people improve their lives.  This was the beginning of TelexFree.

A review of pertinent emails unequivocally demonstrates that Jim's intention, from the beginning, was to build a lawful, viable business—one that offered a real product of legitimate value to agents and customers alike.  Jim hired Ryan Mitchell, a telecommunications engineer, to

build a new softphone product.[8]  Jim envisioned a product that would be used for video calls, conference calls, instant messaging, and an address book – *i.e.*, "to perform similar to Skype." Email dated May 3, 2012.[9]  Jim told Mitchell and Wanzeler that the "Skype project…will trans[form] the company."  Email dated May 24, 2012.  As Mr. Mitchell developed the softphone product, Jim kept working to improve the product and business.  He learned of BlueJimp, a company offering a communicator known as Jitsi, which could be customized with "branding, support and maintenance services as well as on-demand development."  Email dated June 14, 2012.  Mr. Merrill emailed Mr. Mitchell to enlist BlueJimp because it would "cut down on our learning curve and speed up our launch."  *Id.*

With an eye towards bringing a viable product to the marketplace, Mr. Merrill wrote that ***"[t]his product is critical to our company being compliant legally and our overall success***."  *Id.* He offered to get Mr. Mitchell "more help" to complete the project sooner, stressing that TelexFree "***needed product sales to prove the model and just as important make it legal***." Email dated June 20, 2012.  Jim focused on building a product that would "get the agents buying and reselling the product . . . something to get the agents excited about selling products or at least willing to buy for themselves," again stressing it would make them "legal and profitable."  *Id*. Jim emailed his colleagues on July 16, 2012, about the first successful test, noting that the "[q]uality was excellent."  Email dated July 16, 2012.  Clearly, from the very beginning—June and July 2012—Jim was focused on building a legal and compliant MLM business.

---

[8] A softphone is software that allows a user to make telephone calls over the internet via a computer.  *See* http://www.voip-info.org/wiki/view/VoIP+Softphones (last visited Nov. 7, 2016).
[9] Unless otherwise indicated, citations to emails refer to the emails submitted to the Court in Mr. Merrill's Second Sentencing Submission.

The softphone product was to debut on September 17, 2012.  Email dated August 27, 2012.  With the softphone product available to the field, Mr. Merrill sought further logistical, IT and legal assistance.  On the IT side, in January 2013, Jim hired Jay Borromei, an IT expert with significant experience in the MLM industry.  Email dated Jan. 31, 2013 (noting, *inter alia*, that Borromei "helped several MLM companies scale to millions of users & reduce IT nightmares growing companies like ours go through").  On the legal front, Jim first hired Gerald Nehra, an attorney with more than two decades of experience in the MLM industry, who represented himself to be one of the leading American authorities on MLM programs and business.[10]  Jim routinely sought Nehra's advice on their existing compensation plan, potential changes to their plan, and, generally, the need to avoid any legal issues.  *See, e.g.*, Emails dated November 13-25, 2012 (Jim seeking legal advice regarding potential changes to their plan, telling Nehra he wanted to "avoid any problems like Zeek rewards had").  While the government often focuses on isolated emails (plucked from hundreds if not thousands of emails between Jim and the lawyers), in which Mr. Nehra sounded warnings (which are addressed *infra*), it must be stressed here that the lawyers often offered Jim their assurances that the compensation plan could be legally defended.  Indeed, when interviewed by the government, Jay Borromei told the government that another attorney hired by TelexFree, Jeffrey Babener (discussed *infra*) "said words to the effect that Babener did not see anything illegal with the compensation plan but saw things which were atypical and raised red flags."  *See* Govt. Discovery Letter dated December 10, 2014 (submitted in Merrill's First Sentencing Submission) at ¶A(3) (emphasis added).  These types of assurances

---

[10] Attorney Nehra's website can be viewed at http://www.mlmatty.com (last visited Nov. 7, 2016).

would be consistent with the lawyers continued acceptance of their monthly retainer checks, all the way to the conclusion of the company.  *See, e.g.*, Merrill's Second Sentencing Submission.

Mr. Merrill **only** wanted TelexFree to help (not hurt) people, and he was doing everything within his power to steer TelexFree on the proper path.  To be blunt, though, Jim was in way "over his head."  *See, e.g.*, Govt. Discover Letter dated December 10, 2014 (submitted in Merrill's First Sentencing Submission) at ¶D(2) (McMillan notifying government that Merrill told him around March 2014 that he was overwhelmed, in over his head, and needed help at the company).  First, he did not have the business background to manage the company that would become TelexFree.  He was not from McKinsey & Company, nor had he ever served as an executive at some Fortune 500 company.  Far from it—he ran a small commercial cleaning business.  Second, his approach to life—his optimistic nature, his unwavering belief in others, his strong religious beliefs, his charitable and kind disposition—it all made him an easy mark for Wanzeler and Costa.  He did not possess the personality to overrun Wanzeler, or to "desert" him.

IV.   *Pyramid concerns raised in July 2013: Jim pushed and pushed and pushed, but faced an immovable object*.

The MLM field is difficult.  No matter how pure a person's intentions, there exists a population of people within the MLM marketplace that jump from program to program, exploiting the plans for their own personal benefit.  From Jim's perspective, TelexFree's compensation plan Jim incentivized people to actually sell the product because, from a pure mathematical perspective, agents would make more money by selling the product (a 90% commission on a first sale of $49.99, or $45) vs. simply having the company re-purchase (or "buy back") the plans ($20.00).  He naively projected his personal values and ethics onto the entire agent population.  Eventually, though, Jim did realize the company had a problem—that there existed a population of people whose goal was to exploit the company's plan, and he would

spend an immense amount of time and energy, particularly in 2013 and early 2014, pushing and
prodding Wanzeler and Costa to change the company's compensation plan.  In August 2012, a
full-year before Mr. Nehra raised real alarms about the TelexFree plan, Jim emailed Wanzeler to
stress their need to follow their attorney's legal advice:

> "***It does not matter who the lawyer is if the company does not comply with what the
> lawyer recommends or was unable to comply because they were unable to produce a
> product.  They will be shut down.  A lawyer is only as good as a company's ability to
> follow that lawyer[']s recommendations***."

Email dated Aug. 17, 2012.

July 2013 was a turning point in the TelexFree arc.  On July 10, 2013, Jim outlined for
Nehra the changes he was hoping to make to the company's compensation plan—he wanted to
limit any buy-back to an amount roughly equal to their package purchase price (*i.e.*, $289) and,
thereafter, require agents to sell any 99TelexFree account earned from their posting of
advertisements.  *See* Email dated July 10, 2013.  In other words, Jim wanted to eliminate the part
of the plan that created the enormous trailing debt liability that forms the heart of this
prosecution.  Jim outlined his policy objectives in making the change:

1. "Reduce the risk of the associate. They can't lose the money for the
   AdCentral Package or lose very little.

2. We wish to assist our associates in starting their business for a temporary
   time, for the efforts they put forth in advertising our product. Buy Back is
   an incentive to get the word out about our products.

3. ***Emphasis the point of advertising is to sell the product and not to rely on
   the advertise revenue***.

4. They still have the greatest incentive to sell these accounts they receive for
   advertising (90% profit $44.90).

5. ***We eliminate the incentive for associates that do not attempt to sell
   products and only wish to profit from the advertising***."

*Id.* (emphasis added).

Two days later, Jim pushed Wanzeler and Costa on his proposed change.  He told them that Nehra "loves the new qualification we are proposing," adding that Jim "know[s] that change is difficult but in order to do what is right for the agents *we need a solid company that is financially strong*."  Email dated July 12, 2013.   He told them that "[a]gents that come into our company to make money from advertising only with 'no interest in selling products' & building an MLM business *are a poison to Telexfree*."  *Id*.  He also told them that "[e]ven in the US we have associates that look at us as an investment. We are not an investment & this is very dangerous as you well know."  *Id*.  And, he told them the *"changes would make us financially strong, sustainable, legal & ethical*."  *Id*.

That Jim did not have the control or power to make the necessary changes is evident from an email on July 22, 2013 when he again wrote Costa and Wanzeler, telling them he did "not know [whether] you have decided to change the qualification or not.  I hope you have decided to change the qualification. I would like to know before the California trip."  Email dated July 22, 2013.  He ended his email essentially begging for a response:  "Let me know if you think these are good ideas or not. Yes or no, you don't need a big response.  But I would like a response." *Id*.

Things came to a head on July 29 and July 31, 2013.  On July 29th, after receiving an email from a TelexFree agent indicating the agent put more than $12,000 into TelexFree, Nehra wrote that "if the train is about to go off the tracks put the brakes on – now," and that he could "only defend a business model that sells a service to customers that are using the service."  *See* Email dated July 29, 2013.  Mr. Merrill and his IT people spent the next day or so trying to figure out how many actual customers existed; these emails begin to illustrate the IT dysfunction that existed at TelexFree, and the fact that Jim did not have access to the critical business data,

which rested exclusively in the hands of the Brazilian-based IT team.  *See* Emails dated July 23-30, 2013.  On July 29th, Jim wrote an email to Wanzeler and Costa, which provided, *inter alia*:

> ***We can only be warned so many times by Gerry***.  If we don't stop these people from buying multiple positions to become team builders we will have trouble and lots of it.  We must put every effort in stopping people from buying team builders & distorting what Telexfree should be which is a marketing company.  I know & you know TelexFREE is not an investment.  We must do more to stop associates from ruining this great opportunity.

Email dated July 29, 2013.[11]  On July 31, 2013, after receiving another email from a person asking questions about TelexFree, Nehra wrote that something was "very wrong," he asked that his name and picture be taken off the TelexFree website, that the "business model should easily have at least two customers for every rep," that "if the train is going off the tracks—STOP THE TRAIN," and that they should not accept any new reps "until the existing reps produce the active customers needed to right the ship."  *See* Email dated July 31, 2013.

Within days of Nehra's July 31, 2013 email, Jim had engaged attorney Jeffrey Babener to represent TelexFree, a nationally recognized lawyer with approximately three decades of experience representing companies engaged in multi-level marketing, who markets himself as a leading authority in this field.[12]  *See, e.g*., Email dated August 4, 2013.  Babener's website currently provides that "Babener & Associates' legal services provides executives and owners of direct selling, MLM, network marketing, party plan companies with peace of mind, legal safety, and the assurance that you are running a legally-healthy business . . . . We offer you a sense of security *knowing* that you're company is operating legally . . . . There's no need to worry if you

---

[11] Costa, who does not read or write English, was based in Brazil during the pendency of TelexFree.  As such, Costa only wrote emails in Portuguese.  When Costa was a recipient of an email, Jim often included a Portuguese translation of the contents utilizing the Google Translate website.

[12] An in-depth breakdown of Attorney Babener's relevant legal experience is available on his website.  *See* http://www.mlmlegal.com (last visited March 17, 2017).

have us on your team."  *See* http://www.mlmlegal.com/babener.html (last visited March 17, 2017).

On August 5, 2013, Jim was emailing Wanzeler asking to engage Joe Craft to serve as a CFO for the company.  Email dated August 5, 2013.  By August 14, 2013, Jim was emailing Foley Hoag for help with corporate organization, and he was making arrangements for he and Wanzeler to travel to Arizona on September 4th to meet with the Sheffield Group, MLM plan specialists referred to Jim by Babener.[13]  *See* Emails dated August 14, 2013 and August 18, 2013.  By August 19, 2013, Jim was asking Wanzeler if Attorney Babener could help the Brazilian attorneys.  Email dated August 19, 2013.[14]

Jim and Wanzeler met as planned with the Sheffield Group on September 4th in Arizona. The next day, September 5, 2013, Jim wrote Jay Borromei that Wanzeler "was as agreeable as he ever has been on all subjects during our flight home. It was a great ride."  Email dated September 5, 2013.  Jim explained what he believed to be the vision for TelexFree going forward.  *Id.*  He also wrote to Borromei, Wanzeler, Craft and the people at the Sheffield Group on September 5th "to review some of the possible changes to our program that would strengthen our regulatory requirements," which he set out in his email.  Email dated September 5, 2014.

---

[13] An in-depth breakdown of the Sheffield Group's expertise and relevant experience is available on their website.  *See* http://www.sheffieldnet.com (last visited Nov. 7, 2016).
[14] On at least two separate occasions, Mr. Merrill advocated for Wanzeler or Costa to permit Attorney Babener to speak to Ympactus' attorneys in Brazil, imploring that "[h]e could help!" Email dated Sep. 20, 2013; *see also* Email dated Aug. 19, 2013 ("Carlos what do you think. Attorney Babener is offering his services to the Brazil lawyers[.]  I think this will help a lot.  All you have to do is connect them.  Can you do that.").  Costa responded to the August 19, 2013, proposal for assistance that they had everything under control and it would all be resolved within ten days. *Id.*  In fact, everything was not under control—Costa sought bankruptcy protection for Ympactus on September 19, 2013, about one month after his response.

From those days forward, Jim continued to push and push and push Wanzeler and Costa to implement changes to the company's compensation plan, and he continued to seek the advice and counsel of Babener and the Sheffield Group, as well as Nehra.  Intermittently, his frustration that Wanzeler had not yet implemented the necessary changes would boil over into his emails. For example, on October 1, 2013, Jim wrote Wanzeler:

> Carlos, What are we trying to accomplish? What are our goals? It is not keeping the family [plan] . . . We face business failure or jail. Change to focus on where the $100 a week comes from. If it comes from residual no one can there is anything wrong with our program . . . Think about it and let's talk. We are wasting too much energy and valuable resources trying to fit a square peg in a round hole ….

Email dated October 1, 2013.  This is just one of many emails wherein Jim expresses his frustration with Wanzeler and Costa.  In fact, in November 2013, Mr. Merrill contemplated resigning because of the lack of progress in implementing the new plan.  *See, e.g.*, Govt. Discovery Letter dated December 10, 2014 (submitted in Mr. Merrill's First Sentencing Submission) at ¶A7 (Borromei noting Jim threatened to resign).  He discussed resigning with Attorney Babener, but was told that he would still be responsible for historical conduct and he would be better served to stay aboard and be a force for change going forward.

On November 10, 2013, Jim wrote Babener and Sheffield to report that he had "[m]ade some progress with Carlos on this program" and he hoped "to finalize this this week."  Email dated November 10, 2013.  On November 20, 2013, Jim wrote the following to Babener and Sheffield:

> Great progress with Carlos today, it only took 30 sleepless hours. This time it is done. Costa is good also. No big upfront. No Stock. No buyback. Will send details after I have slept a little about 48 up now.

Email dated November 20, 2013.  Yet, in December, Jim was still trying to get Wanzeler and Costa to change the plan.  On December 11, 2013, Jim wrote to Babener and Sheffield, "Good

news, I think. Costa and Wanzeler agree to 60 days retro for weekly AD bonus…"  Email dated

December 11, 2013.  In January 2014, Jim was still frustrated by lack of change.  On January 16,

2014, Jim wrote to Borromei and Wanzeler:

> Jay we can't have one more month of selling large packages of stock. We must
> have all hands on deck to make these changes. I want to have your commitment
> that we have all resources to complete this change. Money is not an obstacle you
> have all the resources you want . . . I may be crazy here but we need to be able to
> show more product revenue right now. No more can we wait. There is an answer
> we just need to get it done. We have the resources we have to get it done.

Email dated January 16, 2014.  That Jim did not possess the control to alone make the changes is

exemplified by the following email, written to Nehra on January 21, 2014:

> ". . . almost done making final changes to the comp plan to make us more
> compliant . . . These changes are the same ones you had asked for when we
> started with you. *I wish we did them then, but unfortunately it was not my*
> *decision alone*."

Email dated January 21, 2014 (emphasis added).  On January 29, 2014, Mr. Merrill was still

arguing against the merits of the big buy-in package, pleading with Borromei, Wanzeler, and

Costa to "get rid of it all together," noting that it "caused us nothing but misery [from] an IT

standpoint."  Email dated Jan. 29, 2014.  In an email on January 30, 2014, Jim noted that they

could not make the changes fast enough.  Email dated January 30, 2014.

It was the same all the way through to March 2014, when TelexFree finally launched its

revised plan.  On March 8, 2014, Babener sent an email to Jim, writing *inter alia*:

> Thank you for letting us assemble a world class professional support team for you and
> for placing your trust in us.  We have been and are doing our best. You have my very best
> wishes for a great roll out this weekend.

Email dated March 8, 2014.[15]

---

[15] Also, it should be noted that the information Jim received from his Brazilian partners often
minimized or misrepresented the pyramid concerns.  Jim was largely kept in the dark by his
partners regarding the legal position of Ympactus, or repeatedly mollified regarding the Brazilian
legal issues. *See, e.g.*, Email dated Sep. 23, 2013, attached as Exhibit _ (Mr. Merrill informs

As referenced earlier, IT delays and failures permeated everything at TelexFree, and it too was a constant source of frustration for Mr. Merrill.  By and large, TelexFree's IT framework was based in Brazil, it was a "major problem," and it meant that Jim largely had no control over or access to the critical business data.  The head of the IT department, a person named Augusto, was apparently living with Costa in Brazil.  Repeatedly, the IT staff and Wanzeler were unable, too busy, or neglected to provide requested internal data or complete requested tasks.  It is simply not fair to suggest that Jim had easy access to the necessary business data—indeed, the bankruptcy and government experts have spent millions of dollars trying to deconstruct the company's business records.  In any event, Mr. Merrill's frustration with his inability to secure the necessary business data is littered throughout the email database.  *See, e.g.*, Email dated Dec. 1, 2013 (in response to CFO Joe Craft requesting the average number of buybacks, Mr. Merrill emailed, "***Good luck I have been asking [for] that for two years***") (emphasis added); Email dated Jan. 16, 2014 (Mr. Merrill requested of Mr. Borromei and Mr. Wanzeler the following: "When reviewing the new site can you make sure the text will inform the customer what countries they can call and that if they call other countries they have limited credit to do so. We have ask[ed] Carlos many times to get per country per minute rate list on the site so people understand how many minutes they can use.  I hope this is finally include[d] in the new site."); Email dated Dec. 10, 2013 (Mr. Merrill emails a telecommunications partner, Mr. Wanzeler and two members of the Brazil IT staff that he "tried to get Carlos or his team to respond to [the

---

Attorney Babener that he first learned of Ympactus declaring bankruptcy a day after it happened, noting that he is "not sure [about] the ramification[s] for Brazil or the US."); Email dated Oct. 24, 2013, attached as Exhibit _ (in relation to a Brazilian court ruling regarding Ympactus, Mr. Merrill wrote to Attorney Babener and Mr. Wanzeler that "the federal Judge feels we are in compliance [f]rom what I understand [from] Carlos.").

telecom partner] several times but with no response…Until he or the Brazil team responds I

don't think there is much I can do."); Email dated Aug. 19, 2013 ("If we didn't have a system

that allows people to fraud us we would not be in the situation.  None of this would be

happening.  IT IS CRIPPLING OUR BUSINESS.  We need to stop it now!").

V.      *General sentencing principles*.

        The controlling legal standards are by now well-rehearsed.  With the Supreme Court

decisions in *United States v. Booker*, 543 U.S. 220 (2005), *Gall v. United States*, 552 U.S. 38

(2007), and *Kimbrough v. United States*, 128 S.Ct. 558 (2007), federal sentencing has undergone

dramatic changes, and the sentencing options available to district courts have significantly

broadened.  *See, e.g., United States v. Taylor*, 532 F.3d 68, 69 (1st Cir. 2008) ("The Court's

decision in *Gall*, combined with its decisions in *Kimbrough* . . . and *Rita v. United States*, 127

S.Ct. 2456, . . . (2007), makes clear that in the post-*Booker* world, district judges are empowered

with considerable discretion in sentencing . . . ."); *United States v. Rodriguez*, 527 F.3d 221, 225

(1st Cir. 2008) ("In *Gall*, . . . the Justices expounded further on a district court's authority to vary

from the guidelines, emphasizing that district courts have wide latitude in making individualized

sentencing determinations"); *United States v. Politano*, 522 F.3d 69, 73 (1st Cir. 2008) ("In view

of the Supreme Court's recent decision in *Gall*, we emphasize that the broad discretion afforded

to the district court is paramount"); *United States v. Martin*, 520 F.3d 87, 90 (1st Cir. 2008)

("*Gall* makes clear that courts of appeals must grant district courts wide latitude in making

individualized sentencing determinations"); *see also United States v.  Thurston*, 544 F.3d 22, 26

(1st Cir. 2008) (affirming sentence which court had twice previously vacated in light of *Gall*'s

broader definition of the deference given to district judges' sentencing decisions).  No longer are

district courts bound by the strictures of the Guidelines or even permitted to presume that the

Guidelines provide the appropriate sentence in a given case. *Gall*, 552 U.S. at 49-50 (the court "may not presume that the Guidelines range is reasonable").

Of course, the Guidelines do remain the starting point and the initial benchmark. Post-*Gall*, however, "the district court's discretion in determining a defendant's sentence is very broad; once the guidelines sentencing range is properly calculated, 'sentencing becomes a judgment call' for the court, and the court may construct a sentence varying from the guidelines sentencing range 'based on a complex of factors whose interplay and precise weight cannot even be precisely described.'" *United States v. Innarelli*, 524 F.3d 286, 291 (1st Cir. 2008), *quoting Martin*, 520 F.3d at 92. To the extent there exist "sound, case-specific reasons" to do so, a sentencing court is authorized to deviate from the Guidelines. *Martin*, 520 F.3d at 91. The post-*Gall* sentencing inquiry, after the court has calculated the GSR, is "broad, open-ended, and significantly discretionary." *Id.* at 92. Moreover, post-*Kimbrough*, sentencing courts may "deviate from the Guidelines in an individual case even though that deviation seemingly contravenes a broad policy pronouncement of the Sentencing Commission." *Politano*, 522 F.3d at 74, *quoting Martin*, 520 F.3d at 96. *See, e.g., Vanvliet*, 542 F.3d at 271.

VI.    *The Guidelines loss table lacks empirical support, its application here "wars with common sense," and "sound, case-specific reasons" render the guideline advisory range entirely irrational here.*

A sentencing process driven largely if not exclusively on a finding of loss ignores many important elements of § 3553(a), as Judge Rakoff poignantly observed in *United States v. Gupta*, 904 F.Supp.2d 349, 350 (S.D.N.Y. 2012):

> The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables **wars with common sense**. Whereas apples and oranges may have but a few salient qualities, human beings in their interactions with society are too complicated to be treated like commodities, and the attempt to do so can only lead to bizarre results.

(emphasis added).  As Judge Rakoff observed in an earlier decision, "[a]s many have noted, the Sentencing Guidelines, because of their arithmetic approach and also in an effort to appear 'objective,' tend to place great weight on putatively measurable quantities, such as the weight of drugs in narcotics cases or the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors."  *United States v. Adelson*, 441 F.Supp.2d 506, 510 (S.D.N.Y. 2006), *aff'd* 301 Fed.Appx. 93 (2d Cir. 2008), *citing generally* Kate Stith & José A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 69 (1998).  "While one might theorize as to why the Sentencing Commission promulgated each of these additions, 'the [Sentencing] Commission has never explained the rationale underlying *any* of its identified specific offense characteristics, why it has elected to identify certain characteristics and not others, or the weights it has chosen to assign to each identified characteristic.'"  *Adelson*, 441 F.Supp.2d at 510 (*quoting* Stith & Cabranes, *supra,* at 69).

In *Adelson*, noting that "an Offense Level of 55 is a level normally only seen in cases involving major international narcotics traffickers, Mafia dons, and the like," Judge Rakoff asked "[h]ow could it possibly apply here?"  *Adelson*, 441 F.Supp.2d at 509.  Judge Rakoff ultimately imposed a sentence of three and one-half years in *Adelson*, a securities fraud case, notwithstanding an advisory guideline range of life imprisonment.  Judge Rakoff called the Guidelines "wildly off-base," *id.* at 515, and called attention to "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings *if not cabined by common sense*."  *Id.* at 512 (emphasis added).  The Court noted:

> ***Where…the calculations under the guidelines have so run amok that they are patently absurd on their face, a Court is forced to place greater reliance on the more general considerations set forth in section 3553(a), as carefully applied to the particular circumstances of the case and of the human being who will bear the consequences***.

*Id.* at 515.

Layered on top of this "sentencing by numbers" issue, several jurists, including Judge Rakoff, have criticized the Guidelines loss table in particular, in part because the evolving astronomical increases in the loss table derive from congressional (political) mandate and they lack empirical support.[16]  As Judge Rakoff observed in *Gupta*, "[f]rom almost the outset," the Guidelines "deviated" from its goal of curing sentencing disparity by tethering sentencing "to what empirical data showed was the average sentence previously imposed by federal judges for that crime…."  *Gupta*, 904 F.Supp.2d at 350.  The deviation is found not only in the disparity between crack and powder cocaine, *see id.* (noting that "the Sentencing Commission had no more empirical basis for imposing the ratio of 18–to–1 than for earlier imposing the ratio of 100–to–1.  In both cases, the numbers were plucked from thin air."), but also in the area of fraud and loss, as Judge Rakoff addressed in *Gupta*:

> While this example is drawn from the area of narcotics, the fundamental point is equally applicable to the instant case. ***Here, as there, the numbers assigned by the Sentencing Commission to various sentencing factors appear to be more the product of speculation, whim, or abstract number-crunching than of any rigorous methodology—thus maximizing the risk of injustice***. Another example of the deviation of the Guidelines from the original goals of the Sentencing Commission—and one more directly relevant to the instant case—is the huge increase in the recommended Guidelines sentences for securities fraud cases. The Guidelines' calculations for this offense are no longer tied to the mean of what

---

[16] The rationale underlying consideration of the GSR established by the Guidelines in weighing the § 3553(a) factors rests upon the assumption that the Sentencing Commission has "base[d] its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise." *Kimbrough*, 128 S.Ct. at 574.  As such, when a particular guideline at issue lacks empirical support, the logic for a sentence driven by that Guideline provision diminishes.

> federal judges had previously imposed for such crimes, but instead reflect an ever
> more draconian approach to white collar crime, unsupported by any empirical
> data.

*Id.* at 351 (emphasis added).

In *Gupta*, the Court discussed "the hypothetical but typical case described by Professor Kate Stith of Yale Law School, involving a typical securities fraud defendant who pled guilty to inflating the financial figures of a public company, thereby causing at least 250 shareholders to collectively suffer a reduction of more than $12.5 million in the value of their shares." *Id.* "In 1987, such a defendant would have faced a Guidelines sentence of 30–37 months; but by 2003, the same defendant would have faced a Guidelines sentence of 151–188 months, a more than 500% increase." *Id.*, *citing* Kate Stith, *Federal Sentencing: The One–Way Ratchet*, New York City Bar Association First Annual Conference on White Collar Crime (May 2012). After noting that the "vast increase in white collar sentencing was partly mandated by Congress, reacting in turn to public outcry over such massive frauds as Enron and WorldCom," the Court observed that "in implementing the Congressional mandate, the Sentencing Commission chose to focus largely on a single factor as the basis for enhanced punishment: the amount of monetary loss or gain occasioned by the offense." *Gupta*, 904 F.Supp.2d at 351. "By making a Guidelines sentence turn, for all practical purposes, on this single factor, [however,] the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, *see* 18 U.S.C. § 3553(a), and, by contrast, effectively guaranteed that many such sentences would be irrational on their face." *Gupta*, 904 F.Supp.2d at 351.

Judge Rakoff is not the only judge to emphasize the irrationality, and total absence of humanity, in sentencing a human being based principally, if not exclusively, on the Guidelines loss table. In a concurring opinion in *United States v. Corsey*, 723 F.3d 366, 379-80 (2d. Cir.

2013), Judge Underhill (United States District Court for the District of Connecticut, sitting by

designation) made the following observation:

> The fraud guideline was initially set forth in Guideline section 2F1.1. The
> Sentencing Commission set the original 1987 Guidelines for economic offenses
> higher than historical sentences in order to further the deterrence and just
> punishment goals of sentencing. In 1989, in response to the savings and loan
> crisis, Congress passed legislation increasing the maximum penalties for financial
> fraud offenses and directing the Sentencing Commission to include specific
> offense characteristic enhancements in the fraud guideline. *See* Robert S. Bennett,
> *et al.*, *Taking it to the Banks: The Use of the Criminal Process to Regulate
> Financial Institutions*, 109 Banking L.J. 28, 28-34 (1992). In 2001, the
> Sentencing Commission amended the Guidelines to combine the fraud, theft and
> embezzlement, and property destruction guidelines into a single guideline, section
> 2B1.1. That change was accompanied by the publication of a new loss table that
> had the effect of increasing offense level calculations, especially for high-dollar-
> value crimes. *See* U.S. SENTENCING COMM'N, REPORT TO THE
> CONGRESS: INCREASED PENALTIES UNDER THE SARBANES–OXLEY
> ACT OF 2002 at 7 (2003). Most recently, the fraud guideline was amended in
> 2003 in response to Congressional directives in the Sarbanes–Oxley Act. *Id.*
> Those amendments included further changes to the loss table that added offense
> level points in the highest loss cases. U.S.S.G. app. C amend. 647 (Nov. 1, 2003).
> The three sets of amendments to the loss table of the fraud guideline alone have
> effectively multiplied several times the recommended sentence applicable in 1987
> for large-loss frauds, which itself was set higher than historic sentences. Each of
> the three increases in the recommended Guideline ranges for fraud crimes was
> directed by Congress, without the benefit of empirical study of actual fraud
> sentences by the Sentencing Commission.

*See also United States v. Musgrave*, 647 F. App'x 529, 538 (6th Cir. 2016) ("[T]here is reason to

believe that, because the loss Guidelines were not developed using an empirical approach based

on data about past sentencing practices, it is particularly appropriate for variances.").

Characterizing the loss guideline as "fundamentally flawed," Judge Underhill concluded:

> The history of bracket inflation directed by Congress renders the loss guideline
> fundamentally flawed, especially as loss amounts climb. ***The higher the loss
> amount, the more distorted is the guideline's advice to sentencing judges***.  As a
> well-known sentencing commentator has put it, "***For the small class of
> defendants ... convicted of fraud offenses associated with very large guidelines
> loss calculations, the guidelines now are divorced both from the objectives of
> Section 3553(a) and, frankly, from common sense***. Accordingly, the guidelines
> calculations in such cases are of diminished value to sentencing judges." Frank O.

Bowman, III, *Sentencing High–Loss Corporate Insider Frauds After* Booker, 20 FED. SENT'G REP. 167, 168 (2008).

*Id*. at 380 (emphasis added).

Likewise, in *United States v. Herink*, 2012 WL 3112002 (D.Neb. July 30, 2012) (unreported), the court observed that "[f]or policy reasons, the Commission did not employ its characteristic empirical approach when setting the Guidelines ranges for white-collar crimes." (*citing* Fifteen–Year Assessment, Executive Summary at vii, 15, 56) (stating that important considerations led the Commission to depart from past practices for crimes such as fraud).  After examining the cause of the rise of the Guidelines ranges for fraud and other offenses, the Court observed that "slightly more than 40 percent of both responding district and circuit court judges also would like greater availability of sentencing options (particularly probation-plus-confinement or 'split' sentences) for theft and fraud offenses."  *Id*., *quoting* Summary Report on the U.S. Sentencing Commission's Survey of Article III Judges at 4.  In *Herink*, in "formulating th[e] sentence, the court [] considered the sentencing range established by the Guidelines, but, because the fraud offense Guidelines were promulgated pursuant to Congressional directive rather than by application of the Sentencing Commission's unique area of expertise, the court afford[ed] them less deference than it would to empirically-grounded Guidelines."  *Id*. at 7.  The Court noted:

> The Guidelines calculation, driven as it is by the substantial amount of loss incurred in this case, is one measure of the seriousness of an offense, ***but is not always a reliable proxy for the culpability of an individual defendant. When losses amount to millions of dollars, the Guidelines' graduated system of increasing culpability aligned with increasing loss is especially skewed. In this case, the amount of loss was magnified by a combination of factors, many of which were beyond the defendant's control***.

*Id*. at 7 (emphasis added).  In the end, the Court held that "[e]ighteen months is a significant sentence to an offender who has never been incarcerated at all."  *Id*. at 8.

28

Also, in *United States v. Parris*, 573 F.Supp.2d 744, 745 (E.D.N.Y. 2008), Judge Block followed Judge Rakoff's reasoning in *Adelson*, greatly departing from the Guidelines range of 360 months to life for a "pump-and-dump" securities fraud, instead sentencing the defendant to 60 months. Judge Block commented that "it is difficult for a sentencing judge to place much stock in a guidelines range that does not provide realistic guidance." *Parris*, 573 F.Supp.2d at 751. After all, "we now have an advisory guidelines regime where, as reflected by this case, any officer or director of virtually any public corporation who has committed securities fraud will be confronted with a guidelines calculation either calling for or approaching lifetime imprisonment." *Id.* at 754. As noted by Judge Gertner in *United States v. Watt*, 707 F.Supp.2d 149, 155 (D. Mass. 2010), "[l]oss under the Guidelines is effectively a proxy for evaluating culpability. Sometimes it is appropriate, and sometimes it is not."[17]

Scholarship has also focused on the sentences for fraud offenses and whether judges are, in actuality, strictly following Guidelines calculations in such cases. A former staff attorney to the U.S. Sentencing Commission engaged in a review of empirical data of recent federal sentences, observing that "[i]t appears that in practice, loss has very little correlation to the ultimate sentence imposed, regardless of how it determines the advisory guideline range." Mark H. Allenbaugh, "*Drawn from Nowhere: A Review of the U.S. Sentencing Commission's White–Collar Sentencing Guidelines and Loss Data*," 26 Fed. Sent'g Rep. 19, 23 (2013). Further, he notes that "**the data suggest[s] that loss is an unsound measure of the seriousness of many offenses, with the result that judges are increasingly willing to go below the Guidelines when**

---

[17] Even under the Guidelines, courts are permitted to depart where a defendant's Guidelines range substantially overstates the seriousness of his conduct, most often in fraud/loss cases. *See, e.g.*, U.S.S.G. §2F1.1, Application Notes (providing that where the loss calculation significantly understates or overstates the seriousness of the defendant's conduct, the district court may depart from the indicated level).

*they impose sentences in white-collar cases*." *Id.* at 19.  Ultimately, Mr. Allenbaugh concludes

that "judges are rightly rejecting Guideline recommendations that are driven excessively by loss"

and that "the fraud Guidelines themselves are in need of a thorough revision, which should start

with a reconsideration of the definition and role of loss." *Id.*  "[L]oss should fundamentally be

reconfigured starting with what the Commission is most experienced with—empirical data." *Id.*

at 26.[18]

VII.     *A sentence of no more than one year and one day in prison is sufficient, and not more*
         *than necessary, to meet the sentencing factors outlined in 18 U.S.C. §3553(a).*

         The issue presented here—as in all sentencing proceedings—is "what" punishment is

fair, necessary, and appropriate, given all of the relevant facts and circumstances; or, in the

words of 18 U.S.C. § 3553(a), what sentence is "sufficient but not greater than necessary" to

serve the sentencing goals enumerated in that statutory section.  "Imposing a sentence on a

fellow human being is a formidable responsibility," compelling "a court to consider, with great

care and sensitivity, a large complex of facts and factors." *Gupta*, 904 F.Supp.2d at 350.  What

sentence should be imposed ultimately involves a complicated analysis of the individual

---

[18] Even under the mandatory Guidelines regime, courts possessed the authority to depart when a
case involved factors taking it "outside the heartland," or where a combination of factors
warranted departure, even if any individual factor did not warrant departure.  U.S.S.G. § 5K2.0
commentary ("The Commission does not foreclose the possibility of an extraordinary case that,
because of a combination of such characteristics or circumstances, differs significantly from the
'heartland' of cases covered by the guidelines in a way that is important to the statutory purposes
of sentencing, even though none of the characteristics or circumstances individually
distinguishes the case"); *see United States v. Jordan*, 162 F.3d 1, 2 (1st Cir. 1998); *United States
v. Coleman*, 188 F.3d 354 (6th Cir. 1999); *United States v. Cook*, 938 F.2d 149 (9th Cir. 1991);
*United States v. Dickey*, 924 F.2d 836 (9th Cir. 1991); *United States v. Jagmohan*, 909 F.2d 61
(2d Cir. 1990); *United States v. Pena*, 930 F.2d 1486 (10th Cir. 1991); *United States v. Big
Crow*, 898 F.2d 1326, 1331-32 (8th Cir. 1990).  Now, in the post-*Booker* regime, the Court is
required to consider any and all circumstances in fashioning a reasonable sentence sufficient but
not more than necessary to meet the sentencing goals outlined in 18 U.S.C. § 3553(a).

involved: what punishment has already been inflicted, is he likely to engage in recidivist behavior, has he been rehabilitated or is he particularly receptive to rehabilitation, and whether his incarceration will significantly further the goals of sentencing.  It is a complex matrix of factors, ultimately dependent upon the individual human being at issue, which is precisely why our criminal justice system has vested this Court with discretion to differentiate and individualize sentencing.  To whatever extent the Court believes a jail sentence is absolutely necessary here, the defense respectfully submits that a sentence of no more than one year and one day is "sufficient, but not more than necessary" to serve the sentencing goals set forth in §3553(a).

First, Mr. Merrill is a first-time offender, having never in life been in contact with the criminal justice system, much less convicted of a crime.  From a sentencing perspective, this is important.  As Judge Gertner noted in *United States v. Germosen*, 473 F.Supp.2d 221, 227 (D. Mass. 2007), there is "a demonstrable difference in the recidivism rates of real first offenders as compared to other defendants in Criminal History Category I."  (*citing* Michael Edmund O'Neill, Abraham's Legacy: An Empirical Assessment of (Nearly) First-Time Offenders in the Federal System, 42 V.C. L.Rev.291 (2001)).  "Minimal or no prior involvement with the criminal justice system is a powerful predictor of a reduced likelihood of recidivism."  *Id.*, citing *A Comparison of the Federal Sentencing Guidelines Criminal History Category and the U.S. Parole Commission Salient Factor Score,* 15 (Jan. 4, 2005), http// www. ussc. gov/ publicat/ Recidivism Salient FactorCom.pdf.  Here, based on everything there is to know about Jim Merrill, there is no appreciable risk of Mr. Merrill engaging in any future criminal conduct, and hence no need to incarcerate him, not to specifically deter him or to protect the public from further crimes.  Indeed, Mr. Merrill, more than anyone, seeks to take every effort to begin rebuilding his reputation in the community.  *See* Letter of James Merrill (Exhibit 1).

Second, in terms of general deterrence, there are not many people who will be in the unique position in which Mr. Merrill found himself—part of an exploding, imperfect company, but at the mercy of other people in terms of the critical decision-making.  However, to the extent this case provides a warning or deterrence to anyone in that position, or to the greater community at large, there are several worthy messages to be issued by the sentencing in this case, all of which would be delivered by a sentence of no more than one year and one day imprisonment. Much of Jim's life has been destroyed.  ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████.  Though he spent a lifetime building a reputation of character, honest, humility and generousness, that reputation has been destroyed in the eyes of the greater community—in all but those relatively few people who know Jim Merrill the best.  Though he and Kristin spent a lifetime of hard work, in honest and decent occupations, to save what they could to provide for their children, their modest savings is gone.  The IRS has recently taken the last of their retirement savings, having already taken money saved for their kids' education, based on phantom income that was never actually retained by the Merrills (and instead seized by, and in the possession of, the government). Frankly, it is a miracle that Jim has the strength and character to rise from bed each morning, to push forward in an effort to support his family.  Anyone paying even an iota of attention to this case has already been adequately deterred; no rational human being—not one—would ever knowingly or intentionally walk the path endured by Mr. Merrill over the past few years, to intentionally endure the pain and devastation inflicted upon him and his family.

Third, considering the characteristics of the human being before the Court, no additional punishment is necessary in this case.  Jim Merrill has been punished enough for a lifetime, and

will continue to be punished for a lifetime.  His restitution obligations—legal or moral—will hang around his neck like an albatross.  *See* Exhibit 1 (Letter of James Merrill) ("I will work the rest of my life to pay these people because I honor my debts . . . I will do it by working until my dying day if necessary").  More importantly, though, as Jim himself notes in his letter, the stain of this case and this prosecution will forever remain with him.  The harm already inflicted upon a true family man like Jim Merrill will remain with him forever.  The Court simply does not need to imprison a person like Jim Merrill to punish him.

Fourth, to the extent the Court is concerned with disparity, Mr. Merrill has pleaded guilty pursuant to an extreme recklessness theory of willful intent.  That factor alone distinguishes this case from most if not all other even arguably relevant cases.  Deviations of the magnitude suggested herein are not unprecedented.  As noted *supra*, in *Adelson*, Judge Rakoff sentenced the defendant to three and one-half years in jail where the offense level was 55 and the advisory guideline range was life imprisonment (here, Probation has calculated an offense level of 43), after noting that "an Offense Level of 55 is a level normally only seen in cases involving major international narcotics traffickers, Mafia dons, and the like."

Fifth, §3553(a)(7) calls for the Court, in fashioning a sentence, to consider the need to provide restitution to any victims of the offense.  Surely, a sentence of no more than one year and one day in jail provides Mr. Merrill the ability to begin that effort as early as possible.  Yes, full restitution is an unreasonable goal in this case.  But, a sentence of no more than one year and one day will provide Jim the opportunity to begin generating restitution to the most-needy of the TelexFree victims as soon as possible.

For all of the reasons articulated herein, and those to be advance at the hearing, the defense respectfully submits that a sentence of no more than one year and one day imprisonment

is fair, just, and more than sufficient to meet the sentencing objectives that underlie §3553(a). As the Court in *Herink* observed, even "[e]ighteen months is a significant sentence to an offender who has never been incarcerated at all…." *Herink*, 2012 WL 3112002, *8. Frankly, a sentence of one year and a day would be an eternity to the Merrill family. For anyone who takes a moment to seriously consider what a sentence of one year in jail actually entails, it is a gravely serious sentence that reflects the serious nature of the conduct at issue and promotes respect for the law. *See* 18 U.S.C. §3553(a)(2)(A). It sends a powerful message to the greater community that penal consequences flow from criminal conduct, even for individuals who have acted only with "extreme recklessness." And, while no jail sentence is "short" to the human being that has to actually spend his time confined to an institution, separated from his loved ones, there exists "considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders." *Adelson*, 441 F.Supp.2d at 514, *citing* Richard Frase, *Punishment Purposes*, 58 Stanford L.Rev. 67, 80 (2005); Elizabeth Szockyj, *Imprisoning White Collar Criminals?*, 23 S.Ill.U.L.J. 485, 492 (1998). As the Sentencing Commission has observed, the Guidelines were written, in part, to "ensure a *short but definite* period of confinement for a larger proportion of these 'white collar' cases, both to ensure proportionate punishment and to achieve deterrence…." United States Sentencing Commission, *Fifteen Years of Guidelines Sentencing* 56 (2004) (emphasis added).

VIII.    <u>Conclusion</u>.

"<b><u>You ruined my life</u></b>."

This is what James Merrill wrote to Carlos Wanzeler after the government executed search warrants at TelexFree. As Wanzeler fled past the border, Jim remained here to shoulder the fallout. Jim's life has been ruined—as he poignantly writes in his letter to the Court, nothing

can ever remove the pain he has suffered or the stain imposed upon him by this case. But, the

defense respectfully submits, a 5 or 10 year jail sentence does not need to be added to that ruin.

It is not necessary to punish this man, it is not necessary to deter him, and it is not necessary to

deter any other rational member of the community at large. The defense respectfully submits

that a sentence of no more than one year and one day imprisonment is sufficient to meet the

goals and purposes of §3553(a).


Respectfully Submitted,
JAMES MERRILL,
By His Attorney,

**/s/ Robert M. Goldstein**
Robert M. Goldstein, Esq.
Mass. Bar No. 630584
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 742-9015
rmg@goldstein-lawfirm.com

Dated:  March 17, 2017



**Certificate of Service**

I, Robert M. Goldstein, hereby state that on this date, March 17, 2017, a true copy of the
foregoing document has been served, via electronic mail, on Andrew Lelling and Neil Gallagher,
Assistant U.S. Attorneys.



**/s/ Robert M. Goldstein**
Robert M. Goldstein